UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SAINT VINCENT CATHOLIC MEDICAL
CENTERS and QUEENSBROOK
INSURANCE LIMITED,

                        Plaintiffs,

         -against-

MORGAN STANLEY INVESTMENT
MANAGEMENT INC.,

                        Defendant.

------------------------------------------------------------x

1:09-CV-9730 (KPC)

AMENDED COMPLAINT



      Plaintiff Saint Vincent Catholic Medical Center ("SVCMC"), on its own behalf and as fiduciary of the Saint Vincent Catholic Medical Centers Retirement Plan (the "Plan"), and plaintiff Queensbrook Insurance Limited ("QIL")[1], a wholly-owned subsidiary of SVCMC, by their undersigned counsel, bring this action against Morgan Stanley Investment Management Inc. ("MSIM"), and allege upon information and belief as follows:

## SUMMARY OF THE ACTION

      1.    This action arises out of MSIM's breach of fiduciary duties owed to SVCMC under the Employee Retirement Income Security Act ("ERISA"). MSIM, as investment manager to the Plan, disregarded its duties to the Plan through gross mismanagement of the fixed-income portion of the Plan's portfolio. MSIM's mandate, as the Plan's fixed-income investment manager, was to manage the portfolio with a focus on preservation of principal. MSIM was specifically charged with the task of customizing a

---

[1] SVCMC and QIL are collectively referred to herein as "Plaintiffs."

fixed-income portfolio for the Plan that would have risk characteristics similar to a conservative bond index specified in investment guidelines supplied by SVCMC to MSIM. Rather than fulfill this fiduciary mandate in the interests of the Plan and its beneficiaries, however, MSIM took aggressive, improper and imprudent risks with the Plan's assets, over-concentrating the fixed-income portfolio in high-risk, mortgage securities.

2. MSIM's egregious mismanagement of the Plan's fixed-income portfolio caused the Plan to sustain substantial damages in excess of $25 million.

3. MSIM's acts and omissions constitute breaches of fiduciary duty under ERISA § 404(a), which imposes upon MSIM the highest fiduciary duties known to the law. Under ERISA § 502(a)(2), SVCMC is entitled to obtain relief under ERISA § 409, which holds MSIM personally liable for the Plan's losses.

4. In addition to its wrongful conduct with respect to the Plan, MSIM also grossly mismanaged SVCMC's multimillion dollar malpractice insurance fund known as the Queensbrook Insurance Limited account (the "Insurance Fund"). The purpose of the Insurance Fund was to meet projected medical malpractice liabilities incurred by SVCMC. As with its mismanagement of the Plan's assets, MSIM employed an improper high-risk strategy in violation of the stated investment objectives for the Insurance Fund, over-concentrating the Insurance Fund's fixed-income portfolio in high-risk, mortgage securities. By this action, Plaintiffs also seek to recover from MSIM losses suffered by the Insurance Fund.

## THE PARTIES

5. SVCMC consists of St. Vincent's Hospital Manhattan and St. Vincent's Westchester, as well as health care facilities in Brooklyn and Staten Island. SVCMC is the academic medical center of New York Medical College in New York City. SVCMC is sponsored by the Roman Catholic Bishop of Brooklyn and the Sisters of Charity of New York.

6. The Plan is an ERISA-covered, defined-benefit retirement plan as a consequence of SVCMC's affirmative election, in 1996, to subject the Plan to ERISA. SVCMC is the Plan's fiduciary and has authority to bring these claims pursuant to ERISA §§ 409 and 502(a)(2).

7. QIL is a limited liability company organized under the laws of the Cayman Islands. QIL is a wholly-owned subsidiary of SVCMC and is the insurer of SVCMC's malpractice liabilities through the Insurance Fund.

8. Defendant MSIM is a registered investment adviser with a worldwide portfolio management business. MSIM's principal offices are located at 522 Fifth Avenue, New York, New York.

9. During all relevant times, MSIM served as investment manager with respect to the fixed-income portfolio of the Plan and the Insurance Fund.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this case because SVCMC seeks relief under the civil enforcement remedies provided by ERISA pursuant to ERISA §§ 404, 406, 409 and 502(a).

11. This Court has supplemental jurisdiction over the state law claim asserted in Counts II and III because they arise from a common nucleus of operative fact.

12. Venue is proper in this district pursuant to ERISA § 502(e)(2) (29 U.S.C. 1132(e)(2)) and 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### MSIM Served As An ERISA Fiduciary Of The Plan

13. The Plan is a defined-benefit pension Plan established and managed for eligible retirees of SVCMC, and governed by ERISA.

14. Pursuant to agreement, SVCMC engaged MSIM to serve as investment manager with respect to the Plan's fixed-income assets. MSIM served in that capacity until its resignation in or about October 2009.

15. As an investment manager to the Plan, MSIM exercised authority and control over the management and disposition of the Plan, and was subject to the fiduciary duties imposed by ERISA. ERISA § 3 (29 U.S.C. § 1102(21)).

16. As a fiduciary, MSIM was required to discharge its duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. §§ 1104(a)(1)(A) and (B). The fiduciary duties of loyalty and prudence owed to the Plan by MSIM are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

17. ERISA imposes a specific duty to diversify the Plan's portfolio so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

18.     Moreover, according to regulations promulgated by the Department of Labor, MSIM's duty included the requirement to determine that the particular investment course of action is reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain associated with the investment course of action.

19.     As explained herein, MSIM mismanaged the Plan's assets and breached the fiduciary duties imposed by ERISA.

### MSIM Mismanaged The Plan's Assets And Breached Its Fiduciary Duties

20.     In connection with its services as investment manager, SVCMC provided MSIM with written investment guidelines promulgated by a subcommittee of SVCMC's Board of Directors. The investment guidelines specified that the "primary investment objective for the Pension Plan shall be preservation of principal with emphasis on long-term growth to meet the future retirement liability of the Plan. Assets shall be invested in accordance with ERISA standards."

21.     The investment guidelines also designated the Salomon Brothers Broad Bond Index as the applicable benchmark against which MSIM's performance as investment manager would be measured. The Salomon Brothers Broad Bond Index, now known as the Citigroup Broad Investment Grade Index or the "Citigroup BIG," is an index commonly used as a benchmark with regard to the management of large debt portfolios. Consistent with the investment policy guidelines generally, the selection of the Citigroup BIG index as a benchmark signaled to MSIM that, as an ERISA fiduciary, it was required to execute a low-risk, conservative investment strategy.

22.     In dereliction of its duties, MSIM deviated from the specified strategy and directed increasingly large amounts of the Plan's assets into high-risk investments including non-agency mortgage securities,[2] thereby exposing the Plan to excessive risk.

23.     Beginning in the fourth quarter of 2007 and throughout 2008 and the first three quarters of 2009, the Plan had significant exposure to non-agency mortgage securities. For example, in the fourth quarter of 2007, 12.6% of the Plan's fixed-income portfolio was invested in non-agency mortgage securities, and in each of the four quarters of 2008, that percentage concentration exceeded 9%. In contrast, the Citigroup BIG, which was supposed to serve as MSIM's benchmark index, had no such exposure.

24.     Similarly, in each of those same quarters, the Plan's overall exposure to mortgage securities in its fixed-income portfolio generally exceeded that of the Citigroup BIG by approximately 10%.

25.     This concentration in mortgage securities generally, and non-agency mortgage securities in particular, was achieved by investing more than 60% of the Plan's fixed-income assets in a single, proprietary fund of MSIM.

26.     MSIM's excessive concentration of the Plan's assets in non-agency mortgage securities correlates with significant underperformance relative to the Citigroup BIG benchmark. Specifically, in the fourth quarter of 2007, the Plan's fixed-income portfolio ended the quarter up 0.8%, trailing the 5.7% increase for the quarter in the Citigroup BIG. Significantly, for the full year of 2008, the Plan's fixed-income portfolio was down 12.0%, while the Citigroup BIG was up 7% during the same period of time.

---

[2]     Non-agency mortgage securities are securities tied to mortgages that are not guaranteed by Fannie Mae or Freddie Mac (the "agencies") because the mortgages fail to meet the agencies' underwriting standards and criteria.

27. In dollar terms, during the relevant period of time, damages to the Plan's assets exceed $25 million in the fixed-income portfolio managed by MSIM.

28. MSIM misrepresented the risk embedded in the fixed-income portfolio. The fixed-income portfolio was purportedly managed to track and modestly exceed the performance of the Citigroup BIG, a broad bond index with no exposure to non-agency mortgage securities and much more limited exposure to mortgage securities generally. MSIM abandoned this conservative investment profile to speculate in high-risk, mortgage-backed investments.

29. These high-risk investments directly exposed the Plan to the volatility of the subprime mortgage market at precisely the time when defaults of subprime mortgages were skyrocketing and numerous subprime lenders were facing insolvency.

30. These securities were not suited to the Plan's conservative strategy with respect to its fixed-income portfolio.

31. MSIM intentionally took on risk for the Plan well in excess of the risk inherent in the designated bond index and well in excess of any normal, acceptable risk associated with the investment of a fixed-income portfolio.

32. Moreover, MSIM failed to properly diversify the fixed income portfolio, achieving a disproportionate exposure to the risk of the mortgage securities markets.

33. Had MSIM managed the fixed-income portfolio appropriately and according to its stated objective and risk level, the losses incurred by the Plan would not have occurred.

34. MSIM knew or should have known that this overexposure to high-risk, mortgage securities was imprudent.

35. Throughout 2007 and 2008, there were warning signs that these securities were not appropriate for the fixed-income portfolio, including increasing defaults on the loans upon which these securities were based.

36. MSIM invested the Plan's assets in subprime mortgage securities issued by IndyMac, Bear Stearns, Washington Mutual and Countrywide, among others.

37. In 2007, analysts recognized the exposure of Morgan Stanley to mortgages in similar securities, and predicted Morgan Stanley would write down $6 billion on the value of these securities.

38. In IndyMac's 2007 Annual Report, its Chairman and CEO announced that, "[t]he 4th quarter of 2007 marked the eighth quarter of the current housing downturn (as measured by housing's contribution to GDP), making it already the fourth worst housing downturn in modern times, and many now predict that, before it turns around, it is going to be the longest and deepest since the Great Depression. . . . As a result of the housing bubble bursting, delinquencies and non-performing home loans increased rapidly in 2007."

39. In fact, in the 3rd quarter of 2007, IndyMac lost $202.7 million.

40. On or about July 2007, Bear Stearns announced that investments backed by risky mortgages had left two of its hedge funds virtually worthless.

41. In the 2nd quarter of 2007, Countrywide's reported earnings fell 33 percent, to $485 million, largely because it had to write down the value of loans and other assets by $923 million. Moreover, Countrywide issued a statement saying "defaults and mortgages were rising across all mortgage categories."

8

42. In December 2007, Standard & Poor's reduced its ratings on about $7 billion of Alt-A mortgage securities, loans considered a step above subprime, as a result of a sustained surge in delinquencies during the prior five months.

43. Even as these and many other problems in the mortgage-backed securities market came to light, MSIM continued to maintain the fixed-income portfolio's allocation to such mortgage securities, thereby reducing the allocation to more conservative and appropriate investments and causing substantial losses to the Plan.

44. Under ERISA §§ 409 and 502(a)(2) (29 U.S.C. §§ 1109 and 1132(a)(2)), MSIM is personally liable for the damages sustained by the Plan.

### MSIM Breaches Its Fiduciary Duties With Respect To The Insurance Fund

45. During the same period of time, MSIM was also entrusted to serve as investment manager with regard to the fixed-income component of the Insurance Fund.

46. MSIM acted as a fiduciary to the Insurance Fund, exercising investment discretion with respect to the Insurance Fund's fixed-income investments.

47. As with the Plan, MSIM was provided with investment guidelines which designated the conservative Lehman Brothers Intermediate Government Index and Lehman Government Index, as the applicable benchmarks against which MSIM's performance as investment manager to the Insurance Fund would be measured.

48. Breaching its contract and its independent fiduciary duties to SVCMC and QIL, MSIM deviated from the specified strategy and directed increasingly large amounts of the Insurance Fund's assets into high-risk investments including non-agency mortgage securities, thereby exposing the Insurance Fund to excessive risk.

49. The over-concentration in mortgage securities in the Insurance Fund was achieved by investing a majority of the Insurance Fund's fixed-income assets in a single, proprietary fund of MSIM.

50. This improper over-concentration in mortgage securities was not suited to the Insurance Fund's investment objectives and caused the Insurance Fund to incur millions of dollars in losses beginning in late 2007 and through the first three quarters of 2009.

51. For the reasons already alleged above, MSIM knew, or should have known, about the risks inherent in the mortgage-backed securities to which it exposed the QIL portfolio.

52. Because MSIM knew that QIL was an insurance fund that required a high-grade, liquid portfolio, it knew, or should have known, that these securities were not suited to the QIL portfolio.

53. The mortgage-backed securities losses suffered by QIL would have been avoided if MSIM had managed the fixed-income portfolio in accord with the mandated investment objectives and the designated benchmark index.

## COUNT I

### Violation Of ERISA § 502 With Respect To The Plan

54. SVCMC repeats and realleges the allegations contained in paragraphs 1-53 as if fully set forth herein.

55. At all relevant times, MSIM acted as a fiduciary of the Plan within the meaning of ERISA.

56. MSIM had a duty of loyalty to invest the Plan's assets in the exclusive interests of the Plan and its beneficiaries.

57. MSIM breached this duty of loyalty by its failure to act in the interests of the Plan and its beneficiaries.

58. MSIM also had a duty to invest the Plan's assets prudently.

59. MSIM was required to monitor the Plan's investments and, if an investment became imprudent, MSIM had a duty to act immediately to protect the Plan from economic harm.

60. MSIM failed to invest the Plan's assets in a prudent manner and exposed the Plan to excessive risk due to an egregious over-concentration in high-risk mortgage securities.

61. MSIM also failed to monitor the Plan's investments to protect the Plan from economic harm.

62. MSIM's breaches caused substantial losses to the Plan.

63. MSIM is personally liable for losses caused by its wrongful conduct pursuant to ERISA § 409.

64. SVCMC is entitled to recover the difference between what the fixed-income portfolio of the Plan would have yielded if MSIM had managed its assets prudently and the actual performance of the Plan.

65. MSIM is liable under ERISA § 502(a)(2) to restore to the Plan all losses caused by MSIM's breaches, as well as all investment management fees earned by MSIM during the period that such breaches occurred.

## COUNT II

### Breach Of Contract With Respect To The Insurance Fund

66. Plaintiffs repeat and reallege the allegations contained in paragraphs 1-65 as if fully set forth herein.

67. Pursuant to contract, MSIM was engaged by QIL to manage the Insurance Fund.

68. MSIM breached its contractual duties by investing in a portfolio that was not suited to the investment objectives of the Insurance Fund and exposing the Insurance Fund to excessive risk due to an extreme over-concentration in high-risk mortgage securities.

69. MSIM's breach of contract caused substantial losses to the Insurance Fund for which MSIM is liable.

## COUNT III

### Breach Of Fiduciary Duty With Respect To The Insurance Fund

70. Plaintiffs repeat and reallege the allegations contained in paragraphs 1-69 as if fully set forth herein.

71. As investment manager to the Insurance Fund, vested with investment discretion over the account, MSIM owed fiduciary duties to Plaintiffs, including duties of loyalty and care.

72. MSIM breached these duties by failing to act in the best interests of Plaintiffs with regard to MSIM's management of the fixed-income portion of the Insurance Fund.

73. MSIM failed to invest the Insurance Fund's fixed-income assets in a prudent manner and exposed the Insurance Fund to excessive risk due to an extreme over-concentration in high-risk mortgage securities.

74. MSIM's breaches caused substantial losses to the Insurance Fund for which MSIM is liable.

WHEREFORE, Plaintiffs demands judgment against MSIM as follows:

(a) ordering MSIM to pay SVCMC and the Plan all such damages as the Plan has sustained as a result of MSIM's misconduct;

(b) ordering MSIM to pay Plaintiffs all such damages as the Insurance Fund has sustained as a result of MSIM's misconduct;

(c) ordering MSIM to disgorge all fees paid by Plaintiffs to MSIM;

(d) awarding attorney's fees as allowed by ERISA and as otherwise allowed by law;

(e) awarding punitive damages with respect to Count III in an amount to be determined at trial; and

(f) granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: New York, New York
February 16, 2010

BUTZEL LONG
a professional corporation

_____
Eric B. Fisher
380 Madison Avenue
New York, New York 10017
Telephone: (212) 374-5359
Facsimile: (212) 818-0494
*Attorneys for Plaintiffs*

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SAINT VINCENT CATHOLIC MEDICAL
CENTERS and QUEENSBROOK
INSURANCE LIMITED,                                :    1:09-CV-9730 (KPC)

                                                  :    AFFIDAVIT OF SERVICE

                        Plaintiffs,               :

            -against-                             :

MORGAN STANLEY INVESTMENT
MANAGEMENT INC.,                                  :

                        Defendant.                :

------------------------------------------------------------x

STATE OF NEW YORK     )
                      )  s.s.:
COUNTY OF NEW YORK    )

        MARIA CACERES-BONEAU, being duly sworn, deposes and says:

        1.    I am a resident of the State of New York, over the age of eighteen years, and not a party to the within action.

        2.    On February 16, 2010, I caused true and correct copy of the Amended Complaint to be served via Regular Mail and via E-mail as indicated below:

**VIA REGULAR MAIL**
**and VIA E-MAIL**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3305
Attorneys for Defendant

_____
MARIA CACERES-BONEAU

Sworn to before me this
17th day of February, 2010

_____
Notary Public

ORLEE GOLDFELD
Notary Public, State of New York
No. 02GO6085147
Qualified in New York County
Commission Expires December 23, ~~2008~~ 2010