UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAINT VINCENT CATHOLIC MEDICAL CENTERS and QUEENSBROOK INSURANCE LIMITED,<br><br>            Plaintiffs,<br><br>v.<br><br>MORGAN STANLEY INVESTMENT MANAGEMENT INC.,<br><br>            Defendant. | **ORAL ARGUMENT REQUESTED**<br><br>09 Civ. 9730 (PKC) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION TO DISMISS</u>**

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
1285 Avenue of the Americas
New York, NY  10019
212-373-3000 (Phone)
212-757-3990 (Fax)

*Attorneys for Defendant Morgan Stanley
Investment Management, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF RELEVANT FACTS ...................................................................... 3

    The Parties and the Complaint ............................................................................ 3

    Pension Fund Agreement, Guidelines, and Investments ...................................... 4

    Insurance Fund Agreement, Guidelines, and Investments ................................... 7

ARGUMENT ................................................................................................................. 8

I.     SVCMC DOES NOT ADEQUATELY ALLEGE THAT MSIM
       DEPARTED FROM THE SPECIFIED INVESTMENT STRATEGY OR
       VIOLATED DUTIES UNDER ERISA ............................................................ 9

       A.     SVCMC Fails To Allege Facts Showing that MSIM Departed
             From the Investment Strategy Agreed Upon by the Parties .................... 10

             1.     MSIM Did Not Depart From the Agreed-Upon Strategy by
                  Investing Pension Fund Assets in the Advisory Mortgage
                  Portfolio ................................................................................. 10

             2.     MSIM Did Not Depart From the Agreed-Upon Strategy by
                  Failing To Invest Pension Fund Assets in Accord With the
                  Fund's Benchmark Index .......................................................... 12

       B.     SVCMC Fails To Allege That MSIM's Decisions To Buy Or Hold
             Mortgage-Backed Securities Violated ERISA Standards at the
             Time They Were Made ........................................................................ 14

II.    QIL DOES NOT ADEQUATELY ALLEGE THAT MSIM DEPARTED
       FROM THE SPECIFIED INVESTMENT STRATEGY OR VIOLATED
       COMMON LAW DUTIES ............................................................................ 20

       A.     MSIM Did Not Breach Its Contractual or Fiduciary Duties By
             Following QIL's Directions To Invest in Mortgage-Backed
             Securities ........................................................................................... 21

       B.     MSIM Did Not Breach Its Contractual or Fiduciary Duties by
             Failing To Invest Insurance Fund Assets in Accord With the
             Fund's Benchmark Index .................................................................... 22

i

C.      QIL Fails To Allege Anything More Than Investment Losses ................ 23

III.    SVCMC'S ERISA CLAIM SHOULD BE  DISMISSED FOR OTHER,
        INDEPENDENT REASONS .............................................................................. 24

        A.      SVCMC Does Not Adequately Allege Loss Causation .......................... 25

        B.      SVCMC Does Not Adequately Allege Any Failure To Diversify .......... 27

        C.      SVCMC Does Not Adequately Allege Any Misrepresentations ............. 28

        D.      SVCMC's Claim Is Barred Because It Failed To Object in Writing
                To the Transactions Within the Required Time Period .......................... 29

IV.     QIL'S COMMON LAW CLAIMS SHOULD BE DISMISSED  FOR
        OTHER, INDEPENDENT REASONS ............................................................. 30

        A.      QIL Does Not Adequately Allege Proximate Causation ........................ 30

        B.      QIL's Common Law Breach of Fiduciary Duty Claim  Is
                Preempted by New York State's Martin Act ........................................... 31

        C.      QIL's Common Law Breach of Fiduciary Duty Claim Should Be
                Dismissed as Duplicative of the Breach of Contract Claim ................... 33

        D.      QIL's Common Law Breach of Fiduciary Duty Claim Is Barred
                By the Economic Loss Doctrine ............................................................. 34

CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbey* v. *3F Therapeutics Inc.*,
No. 06 Civ. 409 (KMW), 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ......... 32-33

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ............................................................... 33

*Alitalia Linee Aeree Italiane, S.p.A.* v. *Airline Tariff Publ'g Co.*,
580 F. Supp. 2d 285 (S.D.N.Y. 2008) ............................................................... 33

*Am. Commc'ns Ass'n, Local 10, I.B.T.* v. *Ret. Plan for Employees of RCA Corp. & Subsidiary Cos.*,
488 F. Supp. 479 (S.D.N.Y. 1980) ..................................................................... 15

*Ashcroft* v. *Iqbal*,
129 S. Ct. 1937 (2009)......................................................................................... 8

*Assured Guaranty (UK) Ltd.* v. *J.P. Morgan Inv. Mgmt., Inc.*,
Index No. 603755/08 (Sup. Ct., N.Y. County, Jan. 29, 2010).............22-23, 24, 32

*Atlas Air, Inc.* v. *Gen. Elec. Co.*,
791 N.Y.S.2d 620 (2d Dep't 2005) ................................................................... 34

*ATSI Commc'ns Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)................................................................................... 8

*Bailey* v. *Lewis Farm, Inc.*,
139 P.3d 1014 (Or. Ct. App. 2006) ................................................................... 31

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ............................................................................................. 8

*Bouriez* v. *Carnegie Mellon Univ.*,
585 F.3d 765 (3d Cir. 2009)............................................................................... 31

*Breakwaters Townhomes Ass'n of Buffalo, Inc.* v. *Breakwaters of Buffalo, Inc.*,
616 N.Y.S.2d 829 (4th Dep't 1994) ................................................................... 32

*Brian M. Kelly Trust* v. *Adkison, Need, Green & Allen, PLLC*,
No. 268550, 2007 WL 708598 (Mich. Ct. App. Mar. 8, 2007) ........................... 31

Page(s)

*Bristol-Myers Squibb, Indus. Div.* v. *Delta Star, Inc.*,
        620 N.Y.S.2d 196 (4th Dep't 1994) .................................................................. 34

*Brooks* v. *Key Trust Co. Nat'l Ass'n*,
        809 N.Y.S.2d 270 (3d Dep't 2006) ............................................................. 33-34

*Caputo* v. *Pfizer, Inc.*,
        267 F.3d 181 (2d Cir. 2001)........................................................................... 28

*Carey* v. *Select Comfort Corp.*,
        No. 27CV 04-015451, 2006 WL 871619 (Minn. Dist. Ct. Jan. 30, 2006) ........... 31

*Castellano* v. *Young & Rubicam, Inc.*,
        257 F.3d 171 (2d Cir. 2001)........................................................................... 33

*Colliton* v. *Cravath, Swaine & Moore, LLP*,
        No. 08 Civ. 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)............ 25

*CPC Int'l Inc.* v. *McKesson Corp.*,
        70 N.Y.2d 268 (1987)............................................................................. 31, 32

*DeBruyne* v. *Equitable Life Assurance Soc'y of U.S.*,
        920 F. Supp. 1342 (N.D. Ill. 1989)............................................................ 18, 19

*DeBruyne* v. *Equitable Life Assurance Soc'y of U.S.*,
        720 F.2d 457 (7th Cir. 1990)................................................................... 18, 26

*Denny* v. *Barber*,
        576 F.2d 465 (2d Cir. 1978)........................................................................... 19

*Dodds* v. *Cigna Sec., Inc.*,
        12 F.3d 346 (2d Cir. 1993)............................................................................ 24

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*,
        343 F.3d 189 (2d Cir. 2003)........................................................................... 31

*First Nationwide Bank* v. *Gelt Funding Corp.*,
        27 F.3d 763 (2d Cir. 1994)............................................................................ 25

*Glaser* v. *Enzo Biochem, Inc.*,
        464 F.3d 474 (4th Cir. 2006)......................................................................... 31

*Graham* v. *Barriger*,
        No. 08 Civ. 9357 (PKC), 2009 WL 3852461 (S.D.N.Y. Nov. 17, 2009) ........ 8, 18

*Grand* v. *Nacchio*,
        147 P.3d 763 (Ariz. Ct. App. 2006) ............................................................... 31

Page(s)

*Greenberg* v. *De Tessieres*,
 902 F.2d 1002 (D.C. Cir. 1990) ......................................................................... 31

*Greene* v. *Hanover Direct, Inc.*,
 No. 06 Civ. 13308 (NRB), 2007 WL 4224372 (S.D.N.Y. Nov. 19, 2007) .......... 33

*Guerrand-Hermès* v. *J.P. Morgan & Co.*,
 769 N.Y.S.2d 240 (1st Dep't 2003).............................................................. 21, 24

*Healthcare Fin. Group, Inc.* v. *Bank Leumi USA*,
 --- F. Supp. 2d ----, No. 08 Civ. 11260 (VM),
 2009 WL 3631036 (S.D.N.Y. Oct. 26, 2009) .................................................... 26

*Heller* v. *Goldin Restructuring Fund, L.P.*,
 590 F. Supp. 2d 603 (S.D.N.Y. 2008) ............................................................... 33

*Holmes* v. *Grubman*,
 --- S.E.2d ----, No. S09Q1585, 2010 WL 424225 (Ga. Feb. 8, 2010) ................ 31

*Horn* v. *440 East 57th Co.*,
 547 N.Y.S.2d 1 (1st Dep't 1989) ...................................................................... 32

*In re Bausch & Lomb, Inc. ERISA Litig.*,
 No. 06 Civ. 6297, 2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) ................ 28-29

*In re Bayou Hedge Fund Litig.*,
 534 F. Supp. 2d 405 (S.D.N.Y. 2007) ............................................................... 33

*In re Citigroup ERISA Litig.*,
 No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009) ........................ 9

*In re Citigroup Inc. S'holder Derivative Litig.*,
 964 A.2d 106 (Del. Ch. 2009).......................................................................... 18

*In re Citigroup Inc. S'holder Derivative Litig.*,
 No. 07 Civ. 9841 (SHS), 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009)............. 18

*In re Computer Scis. Corp. ERISA Litig.*,
 635 F. Supp. 2d 1128 (C.D. Cal. 2009) ............................................................. 26

*In re The First Marblehead Corp. Sec. Litig.*,
 639 F. Supp. 2d 145 (D. Mass. 2009)............................................................... 25

*In re Fortune Sys. Sec. Litig.*,
 680 F. Supp. 1360 (N.D. Cal. 1987)................................................................. 31

*In re Huntington BancShares, Inc. ERISA Litig.*,
 620 F. Supp. 2d 842 (S.D. Ohio 2009).................................................... 9, 17-18

Page(s)

*In re McKesson HBOC, Inc. ERISA Litig.*,
   No. C00-20030, 2002 WL 31431588 (N.D. Cal. Sept. 30, 2002)....................... 28

*In re Merrill Lynch & Co.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ........................................................... 3, 19

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009).......................................................... 17-18

*In re The First Marblehead Corp. Sec. Litig.*,
   639 F. Supp. 2d 145, 164-65 (D. Mass. 2009)................................................... 25

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996).............................................................................. 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) ............................................................. 31

*Jana Master Fund, Ltd.* v. *JPMorgan Chase & Co.*,
   No. 604005/06, 2008 WL 746540 (N.Y. Sup. Ct. Mar. 12, 2008)...................... 32

*Jorgensen* v. *Century 21 Real Estate Corp.*,
   629 N.Y.S.2d 268 (2d Dep't 1995) ................................................................. 30

*Kassover* v. *UBS AG & UBS Fin. Servs., Inc.*,
   619 F. Supp. 2d 28 (S.D.N.Y. 2008) ............................................................... 33

*Kimbrell* v. *Adia, S.A.*,
   929 F. Supp. 373 (D. Kan. 1996) .................................................................... 31

*Laborers Nat'l Pension Fund* v. *N. Trust Quantitative Advisors, Inc.*,
   173 F.3d 313 (5th Cir. 1999)................................................................10, 15, 27

*Landmen Partners Inc.* v. *The Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) ............................................................. 17

*Lanka* v. *O'Higgins*,
   810 F. Supp. 379 (N.D.N.Y. 1992) ................................................................. 29

*Lattanzio* v. *Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007)........................................................................... 25

*Laub* v. *Faessel*,
   745 N.Y.S.2d 534 (1st Dep't 2002).................................................................. 30

*Lefkowitz* v. *Smith Barney, Harris Upham & Co.*,
   804 F.2d 154 (1st Cir. 1986).......................................................................... 23

Page(s)

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................ 3, 26

*Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009)................................................................. 25

*Martin* v. *Heinold Commodities, Inc.*,
    643 N.E.2d 734 (Ill. 1994).............................................................................. 31

*McCabe* v. *Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007)............................................................................ 31

*Nanopierce Techs., Inc.* v. *Southridge Capital Mgmt. LLC*,
    No. 02 Civ. 0767 (LBS), 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003)............ 32

*OCM Principal Opportunities Fund* v. *CIBC World Mkts. Corp.*,
    68 Cal. Rptr. 3d 828 (Cal. Ct. App. 2007)......................................................... 31

*Owens* v. *Gaffken & Barriger Fund, LLC*,
    No. 08 Civ. 8414 (PKC), 2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) ........... 32

*Pippenger* v. *McQuik's Oilube, Inc.*,
    854 F. Supp. 1411 (S.D. Ind. 1994) ................................................................. 31

*Pittleman* v. *Impac Mortgage Holdings, Inc.*,
    No. SACV 07-0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ....................... 18

*Rasmussen* v. *A.C.T. Envtl. Servs. Inc.*,
    739 N.Y.S.2d 220 (3d Dep't 2002) ................................................................... 24

*Rivkin* v. *Heraeus Kulzer GmbH*,
    734 N.Y.S.2d 31 (1st Dep't 2001)..................................................................... 34

*Robin Bay Assocs.* v. *Merrill Lynch & Co.*,
    No. 07 Civ. 376 (JMB), 2008 WL 2275902 (S.D.N.Y. June 3, 2008)................. 34

*Rubin* v. *Schottenstein, Zox & Dunn*,
    119 F. Supp. 2d 787 (S.D. Ohio 2000) .............................................................. 31

*S. Cherry St., LLC* v. *Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009)................................................................................. 9

*Sabella* v. *Scantek Med., Inc.*,
    No. 08 Civ. 453 (CM) (HBP), 2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009)..... 33

*Schaaf* v. *Residential Funding Corp.*,
    517 F.3d 544 (8th Cir. 2008)............................................................................ 31

**Page(s)**

*Schetter* v. *Prudential-Bache Sec. Inc.*,
    695 F. Supp. 1077 (E.D. Cal. 1988) .................................................................. 30

*Sedona Corp.* v. *Ladenburg Thalmann & Co.*,
    No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005).... 33

*Silverman* v. *Mutual Benefit Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998)............................................................................... 25

*Trump Int'l Hotel & Tower* v. *Carrier Corp.*,
    524 F. Supp. 2d 302 (S.D.N.Y. 2007) .............................................................. 34

*Ulico Cas. Co.* v. *Clover Capital Mgmt., Inc.*,
    217 F. Supp. 2d 311 (N.D.N.Y. 2002).............................................................. 15

*Ulico Cas. Co.* v. *Clover Capital Mgmt., Inc.*,
    335 F. Supp. 2d 335 (N.D.N.Y. 2004).............................................................. 18

*United States* v. *Mason Tenders Dist. Council of Greater New York*,
    909 F. Supp. 882 (S.D.N.Y. 1995) ................................................................... 15

*Vaso Active Pharms., Inc.* v. *Robinson & Cole LLP*,
    No. 06-4958, 2009 WL 971161 (Mass. Super. Jan. 23, 2009) ........................... 31

*Vladimir* v. *Cowperthwait*,
    839 N.Y.S.2d 761 (1st Dep't 2007)............................................................. 23-24

*Whitehall Tenants Corp.* v. *Estate of Olnick*,
    623 N.Y.S.2d 585 (1st Dep't 1995)................................................................. 32

*Yu* v. *State St. Corp.*,
    --- F. Supp. 2d ----, MDL No. 1945, No. 08 Civ. 8235 (RJH), 2010 WL 668645
    (S.D.N.Y. Feb. 25, 2010) ................................................................................. 17


**STATUTES AND RULES**

29 U.S.C. § 1104(a)(1)........................................................................................ 9, 27

Fed. R. Civ. P. 8................................................................................................... 28

Fed. R. Civ. P. 9(b) ............................................................................................. 28

Fed. R. Civ. P. 12(b)(6)......................................................................................... 1

N.Y. Gen. Bus. Law, Article 23-A § 352 *et seq.*.................................................. 31

**Page(s)**

## OTHER AUTHORITIES

Ben Bernanke, Speech at Federal Reserve Bank of Chicago's 43rd Annual Conference on
  Bank Structure and Competition, May 17, 2007, *available at*
  http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm ..... 19

The Handbook of Mortgage-Backed Securities (Frank J. Fabozzi, ed., 3d ed. 2006)...... 16

International Monetary Fund, Global Financial Stability Report, April 2007, *available at*
  http://www.imf.org/external/pubs/ft/gfsr/2007/01/pdf/text.pdf .......................... 16

Kevin LaCroix, The D&O Diary: Subprime and Credit Crisis-Related Securities Class
  Action Lawsuits (2010), *available at* http://www.oakbridgeins.com/
  clients/blog/subprimelawsuitslist.doc................................................................. 20

Henry Paulson, Testimony Before U.S. House of Representatives Financial Services
  Committee, Nov. 18, 2008, *available at* http://
  financialservices.house.gov/hearing110/paulson111808.pdf ............................ 19

David Ruder, Testimony Before U.S. House of Representatives Committee on Oversight
  and Government Reform, Nov. 13, 2008, *available at* http://
  oversight.house.gov/images/stories/documents/ 20081113101847.pdf .............. 19

Securities and Exchange Commission, "Index Funds," *available at*
  http://www.sec.gov/answers/indexf.htm ........................................................... 14

Jody Shenn, S & P Cuts Alt-A Mortgage Bonds; Analysts Warn on Prime (Update 3),
  Bloomberg, Dec. 19, 2007, *available at* http://www.bloomberg.com/apps/
  news?pid=20601009&sid=a891s97DJR1E ....................................................... 17

Vanguard Total Bond Market Index Fund Fact Sheet (2010), *available at*
  https://institutional.vanguard.com/iippdf/pdfs/FS222R.pdf ............................... 14

Defendant Morgan Stanley Investment Management, Inc. ("MSIM") respectfully submits this memorandum of law in support of its motion to dismiss plaintiffs' amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### Preliminary Statement

Plaintiffs St. Vincent Catholic Medical Centers ("St. Vincent" or "SVCMC") and Queensbrook Insurance Limited ("Queensbrook" or "QIL") allege that MSIM, their former investment manager, breached contractual and fiduciary duties between 2007 and 2009 by investing their assets in portfolios containing mortgage-backed securities and, in particular, non-agency mortgage-backed securities. The core of plaintiffs' claim is that these investments were inconsistent with the investment strategies agreed to by the parties, as reflected in their investment agreements, the accompanying investment guidelines, and the benchmark indices applicable to the relevant accounts.

But the investment agreements, guidelines, and related documents on which plaintiffs purportedly rely *contradict* their claims: St. Vincent and Queensbrook *explicitly authorized* investment in the precise types of securities identified in the complaint. Both prior to and subsequent to these authorizations, MSIM provided plaintiffs with annual prospectuses, annual and semi-annual shareholder reports and other materials that disclosed that the investment portfolios included mortgage-backed securities (including non-agency mortgage-backed securities) and described the risks of such investments. MSIM also provided plaintiffs with monthly account statements that disclosed the specific types of mortgage-backed securities in which MSIM had invested on plaintiffs' behalf. Thus, plaintiffs authorized and were aware of these specific investments as far back as the 1990s and fail to state a claim that MSIM deviated from the parties' agreed-upon investment strategies.

Plaintiffs also fail to allege facts showing that MSIM's decisions to acquire and hold these investments violated applicable standards of care *at the time they were made*. The complaint cherry-picks a handful of adverse market developments in 2007, such as losses suffered by certain issuers of subprime securities, and alleges that these events show MSIM's recklessness. But plaintiffs fail to allege any connection between these developments and the decline (or likelihood of future decline) in value of the particular mortgage-backed securities in *their accounts*. Indeed, plaintiffs ignore the well-recognized failure of virtually all regulators and market participants to predict the collapse of the mortgage market and its subsequent effect on the overall economy. Rather, their complaint boils down to the proposition that, because they lost money through mortgage investments, MSIM must have breached its duties by making those investments. Such claims have repeatedly been dismissed.

For these reasons, SVCMC's claim that MSIM violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, should be dismissed. (*See* pp. 9-20 *infra*.) QIL's claims that MSIM violated contractual and common law fiduciary duties should likewise be dismissed. (*See* pp. 20-24 *infra*.)

Plaintiffs' claims also should be dismissed for several independent reasons:

*First*, SVCMC's ERISA claim should be dismissed because SVCMC does not adequately allege (a) that MSIM's supposed ERISA violations caused SVCMC's losses or (b) that MSIM made any misrepresentations or violated any duty to diversify under ERISA. Moreover, this claim is barred by a provision of the investment management agreement under which SVCMC waived the right to bring claims respecting investments to which it did not make a timely objection in writing to MSIM. (*See* pp. 24-30 *infra*.)

*Second*, both of QIL's claims should be dismissed because QIL does not adequately allege proximate causation of its alleged losses.  The breach of fiduciary duty claim also should be dismissed because it is (a) preempted by New York's Martin Act, which precludes private tort claims in the securities context other than those sounding in fraud, (b) duplicative of the breach of contract claim, and (c) barred by the economic loss doctrine.  (*See* pp. 30-34 *infra*.)

MSIM thus respectfully asks that the Court dismiss the complaint, with prejudice.

## Statement of Relevant Facts[1]

### *The Parties and the Complaint*

SVCMC maintains a defined-benefit pension fund for its employees that is allegedly governed by ERISA.  (Compl. ¶¶ 6, 13.)  QIL, St. Vincent's subsidiary, insures SVCMC's malpractice liabilities through an insurance fund.  (*Id*. ¶ 7.)  MSIM managed the fixed-income portfolios of the pension and insurance funds.  (*Id*. ¶ 9.)  The complaint centers on MSIM's investment decisions between the fourth quarter of 2007 and the third quarter of 2009.

With respect to the pension fund, the complaint alleges that MSIM "invest[ed] more than 60% of the [fund's] fixed-income assets in a single, proprietary fund of MSIM" (*id*. ¶ 25), thus achieving an "excessive" concentration in "mortgage securities generally, and non-agency mortgage securities in particular" (*id*. ¶¶ 25, 26).  These investments allegedly were inappropriate because they diverged from the components of the benchmark index identified in the fund's investment guidelines, whose performance MSIM was allegedly supposed to "track

---

[1]   The facts in this section are derived from the complaint and from documents that are referred to and incorporated by reference in the complaint.  Copies of all documents cited in this memorandum are submitted herewith as exhibits to the Affidavit of Joseph A. Braccia, dated March 2, 2010 (the "Braccia Affidavit" or "Braccia Aff.").  The Court may consider all of these documents on this motion to dismiss.  *See, e.g.*, *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (Pollack, J.), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

and modestly exceed." (*Id.* ¶ 28.)  Count one of the complaint asserts that MSIM's management of the pension fund assets breached fiduciary duties imposed by ERISA.

Similarly, with respect to the insurance fund, the complaint alleges that MSIM "deviated from the specified strategy" by "direct[ing] increasingly large amounts of the Insurance Fund's assets into high-risk investments including non-agency mortgage securities." (*Id.* ¶ 48.)  MSIM allegedly invested a majority of QIL's assets in a "single, proprietary fund of MSIM" (*id.* ¶ 49) and failed to manage the fund in accord with its "designated benchmark index" (*id.* ¶ 53).  Counts two and three of the complaint allege that MSIM's management of the insurance fund breached common law contractual and fiduciary duties, respectively.

**Pension Fund Agreement, Guidelines, and Investments**

In October 1997, Miller Anderson & Sherrerd, LLP, a predecessor of MSIM, entered into an investment management agreement with St. Vincent's Hospital, a predecessor of SVCMC, to manage the fixed-income portion of the pension fund's assets.  (Braccia Aff. Ex. 1.) The agreement gave MSIM control over investment decisions, subject to the investment guidelines set forth in an attachment.  These guidelines provide that the investment objective for the pension fund is "preservation of principal with emphasis on long-term growth to meet the future retirement liability" of SVCMC (Braccia Aff. Ex. 2, at 2, "Pension Plan") and that the "total return . . . is expected *to exceed* the total return of the designated fixed income benchmark," the Salomon Brothers Broad Bond Index (now the Citigroup Broad Investment Grade Index or "Citigroup BIG")  (*id.* at 3, "Fixed Income Managers" ¶ 1 (emphasis added)). The guidelines also contain thirteen paragraphs of "Investment Manager Restrictions" that give detailed, concrete, and quantitative directives, such as prohibiting short selling and requiring the portfolio to have a weighted average credit rating of AA or better by Standard & Poor's or Aa or

better by Moody's.  (*Id.* at 6-7, "Investment Manager Restrictions.")  SVCMC does not allege a violation of any of these restrictions.

As relevant here, the guidelines restricted MSIM from investing in derivative securities, including certain types of mortgage-backed securities, absent "written approval" from St. Vincent.  (*Id.* at 6, "Investment Manager Restrictions" ¶ 1.)  However, MSIM asked St. Vincent for permission to invest in such securities, explaining that it "typically overweight[ed] mortgages heavily because of their high credit quality and yield advantage to Treasuries." (Braccia Aff. Ex. 3.)  In response, St. Vincent's investment committee provided a November 26, 1997 memorandum titled "Written Approval to Invest in Certain Securities as Required by the Hospital's Investment Policy Statement":

> The Investment Committee of St. Vincent's Hospital (Hospital) understands that [MSIM] uses derivative securities to manage the mortgage sector of fixed income portfolios.  Specifically, [MSIM] uses a pooled investment vehicle to hold mortgage securities for its separately managed fixed income accounts.  This vehicle is the . . . Advisory Mortgage Portfolio (AMP). . . .  *[T]he Hospital hereby authorizes [MSIM] to utilize the AMP to hold mortgage securities in the fixed income accounts managed by [MSIM] for the Hospital*.

(Braccia Aff. Ex. 4, ¶ 1 (emphasis added).)

The AMP was the "single, proprietary fund" (Compl. ¶ 25) through which the complaint alleges that MSIM exposed the pension fund to inappropriate mortgage-backed securities.  Beginning in 1997, MSIM provided St. Vincent with annual prospectuses and statements of additional information ("SAIs") reflecting that the AMP invested principally in mortgage securities and "*may invest, without limit,*" in such securities *"issued by private issuers*" (emphasis added).[2]  These documents disclosed that "*there are no direct or indirect Government*

---

[2]     1997 Prospectus, Braccia Aff. Ex. 5, at 13.  The St. Vincent investment committee acknowledged receiving a copy of the 1997 Prospectus as part of the investment management agreement.  (*See* Braccia Aff. Ex. 1, ¶ 6.)

*guarantees of payments*" with respect to non-agency mortgages, that such securities "*may entail greater risk*" (emphases added),[3] and that "[i]t is possible for an investor to lose money by investing in the [AMP]."[4]

MSIM also sent SVCMC annual and semi-annual shareholder reports listing every security in the AMP, broken down into categories that specifically showed that the portfolio included non-agency mortgage securities.[5]  Further, MSIM sent SVCMC monthly account statements showing the number of AMP shares the pension fund bought, sold, and held; beginning in 2008, these statements categorized MSIM's exposure, via the AMP, to six types of agency mortgages and three types of non-agency mortgages.[6]  By its authorization, SVCMC manifested its understanding and consent that the pension fund would hold shares in the AMP, and be exposed to the mortgage securities it contained.

Consistent with St. Vincent's authorization "to utilize the AMP to hold mortgage securities," MSIM consistently invested a majority of the pension fund assets in the AMP dating back to the inception of the current pension fund account in 2002 and continuing through the

---

Identical statements appear in the prospectus or SAI (incorporated by reference into each prospectus) for every year from 1997 through 2009.  Copies of these documents are available upon request.  Starting in 2002, the prospectuses were issued by the Morgan Stanley Institutional Fund Trust ("MSIFT").  In 2006, MSIFT changed the name of the AMP to the Advisory Portfolio.  For simplicity's sake, this memorandum refers to the portfolio at all times as the AMP.

[3]    1997 SAI, Braccia Aff. Ex. 6, at 13-14, 15; 2007 SAI, Braccia Aff. Ex. 7, at 29, 30.  The same statements were part of every SAI from 1997 to 2009.

[4]    *E.g.,* 2007 Prospectus, Braccia Aff. Ex. 8, at 5.  This warning was added to the prospectuses starting in 2000.

[5]    The categories included "Agency Adjustable Rate Mortgages," "Agency Fixed Rate Mortgages," "Collateralized Mortgage Obligations—Agency Collateral Series," "Collateralized Mortgage Obligations—Non-Agency Collateral Series," and "Mortgages—Other" (sorted by private issuer).  (*E.g.*, MSIFT Semi-Annual Report 2007, Braccia Aff. Ex. 9, at 3-7.)

[6]    *E.g.*, Pension Fund Account Statement Mar. 31, 2009, Braccia Aff. Ex. 10.

2007-09 period of which plaintiffs now complain.[7]  But at no point prior to 2009 did SVCMC rescind its authorization to hold shares in the AMP, or direct MSIM to sell its AMP shares.

### Insurance Fund Agreement, Guidelines, and Investments

In July 1993, MSIM began managing the fixed income assets of Queensbrook's insurance fund.  The investment management agreement authorized MSIM to act in its discretion, "consistent with the limitations defined by [the] account."  (Braccia Aff. Ex. 12.)  The corresponding investment guidelines imposed seven restrictions resembling those governing the pension fund, such as maintaining the average weighted credit quality of the total portfolio at a minimum of Aa/AA by Moody's and Standard & Poor's, respectively (Braccia Aff. Ex. 13, ¶ 2).  QIL does not allege a violation of any of these restrictions.

The guidelines directed MSIM to invest in mortgage-backed securities.  (*Id*. ¶ 5.)  It is not disputed that MSIM followed the directive of the guidelines in this respect by investing QIL's funds directly in mortgage-backed securities.  Beginning in 2007, MSIM invested insurance fund assets in a portfolio known as the Offshore AMP ("OAMP"), an analogue to the AMP designed for offshore clients like Cayman Islands-based QIL.  Prior to making this investment, MSIM sent QIL a Private Placement Memorandum that explained that the OAMP "will invest primarily in mortgage securities" and "may invest in securities issued or guaranteed by . . . non-agency issuers."  (Braccia Aff. Ex. 14, at 12, 14.)  It further explained that "*mortgage-backed securities issued by private issuers . . . may entail greater risk*," that "[a]n investment in the [OAMP]" is "speculative and involves a high degree of risk," and that "[t]here is no assurance" that an investment "will be profitable or that a Shareholder will not lose some or

---

[7]     For instance, account records show that as of December 2002, when the pension fund portfolio referenced in the complaint was formed by consolidating four separate St. Vincent accounts, the fund had 60% of its assets invested in the AMP.  (*See* Braccia Aff. Ex. 11, at 6.)

all of its investment." (*Id.* at 14, 33 (emphases added).)  QIL does not, and cannot allege, that it did not specifically authorize MSIM to invest in the OAMP.

      Like SVCMC, QIL received monthly account statements reflecting how much of the insurance fund's assets were invested in the OAMP and in various types of mortgage-backed securities.[8]  At no point prior to 2009 did QIL rescind its authorization to hold shares in the OAMP, or direct MSIM to sell its OAMP shares.

## <u>Argument</u>

      To survive a motion to dismiss under Rule 12(b)(6), SVCMC and QIL must "raise a right to relief above the speculative level"[9] by alleging facts showing "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Id.* at 1949-50 (internal quotation marks and brackets omitted).  Allegations "merely consistent" with liability fall short of alleging a plausible claim for relief.  *Id.* at 1949 (internal quotation marks omitted).  As this Court recently observed, "[o]nly nonconclusory factual allegations are to be accepted as true."  *Graham* v. *Barriger*, No. 08 Civ. 9357 (PKC), 2009 WL 3852461, at *5 (S.D.N.Y. Nov. 17, 2009).  Conclusions unsupported by the facts alleged, legal conclusions, bald assertions or unwarranted inferences do not qualify.  *See Twombly*, 550 U.S. at 555-56.

---

[8]  *E.g.*, Insurance Fund Account Statement, Mar. 31, 2009, Braccia Aff. Ex. 15.

[9]  *ATSI Commc'ns Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)).

Courts have not hesitated to dismiss deficient complaints under ERISA.  *See*, *e.g.*, *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *5, *15 (S.D.N.Y. Aug. 31, 2009) (dismissing ERISA claims in part because allegations were "entirely conclusory" and insufficient under *Twombly* and *Iqbal*); *In re Huntington BancShares, Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (plaintiffs' complaint "merely sets out the 'formulaic recitation of the elements' of their [ERISA] breach of fiduciary duty cause of action . . . , leaving it conceivable; however, completely implausible" (quoting *Twombly*, 550 U.S. at 555)).   The same is true for common law claims.  *See*, *e.g.*, *S. Cherry St., LLC* v. *Hennessee Group LLC*, 573 F.3d 98, 100, 103-04 (2d Cir. 2009) (applying *Iqbal* to New York contract claim).

## I.

## SVCMC DOES NOT ADEQUATELY ALLEGE THAT MSIM DEPARTED FROM THE SPECIFIED INVESTMENT STRATEGY OR VIOLATED DUTIES UNDER ERISA

ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   29 U.S.C. § 1104(a)(1)(B).   SVCMC's claim that MSIM breached this duty when it "abandoned" the investment strategy spelled out in the pension fund investment management agreement and guidelines to "speculate in high-risk mortgage-backed investments" (Compl. ¶ 28) fails for two reasons.

*First*, the only nonconclusory *facts* SVCMC pleads to allege that MSIM "deviated from the [pension fund's] specified strategy" (*id*. ¶ 22) are refuted by the documents on which SVCMC purports to reply:  SVCMC *expressly authorized* use of the AMP to hold mortgage-backed securities, including non-agency mortgage-backed securities.   Any claim that these investments were inconsistent with the agreed-upon parameters must therefore fail.

*Second*, SVCMC fails to plead any nonconclusory facts alleging that MSIM's decisions to purchase and then hold the mortgage-backed securities in its account violated ERISA's duty of care at the time they were made—only that the investments turned out poorly. But plaintiffs cannot plead breach of fiduciary duty by hindsight.

SVCMC thus fails to state an ERISA claim.  *See Laborers Nat'l Pension Fund* v. *N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 320-23 (5th Cir. 1999) (investment in interest-only mortgage-backed securities did not violate ERISA where such investment "was not a violation of the investment guidelines or their spirit"; such securities were not on the list of banned investments, the investment was consistent with the growth objectives of the portfolio as a whole, and "the investment community did not anticipate the sudden, unprecedented decrease in interest rates" that led to plaintiffs' losses).

### A.   SVCMC Fails To Allege Facts Showing that MSIM Departed From the Investment Strategy Agreed Upon by the Parties

SVCMC alleges only two facts in support of its claim that MSIM departed from the strategy it agreed to implement for the pension fund:  (a)  that MSIM invested 60% of the fund's fixed income assets in a "single, proprietary fund of MSIM" (Compl. ¶ 25); and (b) that MSIM exposed the pension fund to different types and amounts of mortgage-backed securities than the fund's benchmark index (*id.* ¶¶ 23-24).  Neither allegation supports SVCMC's claim.

### 1.   *MSIM Did Not Depart From the Agreed-Upon Strategy by Investing Pension Fund Assets in the Advisory Mortgage Portfolio*

SVCMC contends that MSIM breached its fiduciary duties under ERISA by investing in the AMP and thereby departing from the parties' agreements respecting the pension fund.  (*See* Compl. ¶ 25.)  This contention is meritless.  MSIM's actions were consistent with the investment strategy, because St. Vincent's investment committee *expressly authorized* MSIM in writing to place pension fund assets in the AMP:  "*[T]he Hospital hereby authorizes [MSIM] to*

*utilize the AMP to hold mortgage securities in the fixed income accounts managed by [MSIM] for the Hospital.*"  (Braccia Aff. Ex. 4.)

SVCMC nevertheless suggests that MSIM diverged from the strategy chosen for the pension fund because it invested too heavily in the AMP and because the AMP's holdings, in particular its non-agency mortgages, were inappropriate.  Both claims are unavailing.

*First*, no provision of the investment management agreement or guidelines (as amended by SVCMC's written authorization to use the AMP) limited the amount of pension fund assets MSIM could place in the portfolio.  SVCMC easily could have imposed such a limit if it wished to; the investment guidelines contain a section titled "Investment Manager *Restrictions*" listing thirteen concrete, detailed, quantitative limitations, and SVCMC could have incorporated any limit in its written authorization.  But nothing in the guidelines or written authorization caps the level of investment in the AMP.

*Second*, SVCMC does not identify any pension fund restriction MSIM violated through its use of the AMP.[10]  SVCMC pleads that the pension fund's stake in the AMP resulted in 9% to 12.6% of fund assets consisting of non-agency mortgage securities.  (Compl. ¶ 23.)  But SVCMC does not, and cannot, point to any pension fund restriction placing a ceiling on non-agency mortgages.  And it cannot escape the fact that when it agreed to invest in the AMP, it agreed to be exposed to the mortgage-backed securities the portfolio held, including non-agency mortgage securities.

Every year starting in 1997—when SVCMC authorized investment in the AMP— St. Vincent received prospectuses and SAIs stating that the AMP "*may invest, without limit,*" in mortgage-backed securities "*issued by private issuers*" and disclosing the risks of such

---

[10]   Indeed, the guidelines acknowledge that SVCMC "cannot impose specific restrictions on pooled investment vehicles" such as the AMP.  (Braccia Aff. Ex. 2, at 5, "Investment Manager Restrictions.")

investments. Shareholder reports disclosed and quantified all of the AMP's holdings in such securities, listing them in categories such as "Mortgages—Other" and "Collateralized Mortgage Obligations—*Non-Agency Collateral Series*."[11] Monthly account statements showed that a majority of the pension fund's assets were invested in the AMP and, after mid-2008, disclosed the specific allocation of pension fund assets to nine types of mortgage securities, including three types of non-agency mortgage securities.

SVCMC cannot complain after the fact that the investment of its assets in these securities was inconsistent with its investment objectives or violated the investment guidelines. The securities complained of were fully contemplated and approved by SVCMC's express authorization as suitable for the pension fund. And St. Vincent was well aware from the numerous disclosures MSIM provided, as well as shareholder reports and pension fund account statements, that its pension fund assets were invested in mortgage securities, including non-agency mortgage securities.

2. ***MSIM Did Not Depart From the Agreed-Upon Strategy by Failing To Invest Pension Fund Assets in Accord With the Fund's Benchmark Index***

SVCMC also alleges that MSIM "abandoned" the agreed-upon strategy for the pension fund by failing to "track" the fund's benchmark index (Compl. ¶ 28) and by taking on risk "in excess of the risk inherent" in the index (*id.* ¶ 31). SVCMC alleges that the relevant benchmark index, the Citigroup BIG, itself included no non-agency mortgages at the time the pension fund held a 9-to-12.6% stake in such securities (*id.* ¶ 23), and that the pension fund's "overall exposure to mortgage securities . . . generally exceeded that of the Citigroup BIG by

---

[11]   *See*, *e.g.*, MSIFT Semi-Annual Report 2007, Braccia Aff. Ex. 9, at 5-7 (emphasis added).

approximately 10%" (*id*. ¶ 24).   Again, SVCMC fails to allege any breach of MSIM's duties under ERISA; MSIM was not supposed to "track" or mimic the Citigroup BIG, but to beat it.

       *First*, the guidelines themselves recognize that the Citigroup BIG was not designed to provide a roster of permissible investments, but rather to set a performance target for MSIM to outdo.   The guidelines provide that "[t]he total return" for MSIM as fixed income manager "is expected *to exceed* the total return of the designated fixed income benchmark." (Braccia Aff. Ex. 2, at 3 (emphasis added).)   Notably, this statement appears in a section of the guidelines designated "*Performance Goals*"—not in the separate section titled "Investment Manager *Restrictions*."   In the latter section, only one restriction mentions the benchmark, and it says nothing about restricting the type or amount of securities in the portfolio to those in the benchmark index.   It states that the modified effective duration of the portfolio must be within a certain range of that of the benchmark.   (*Id*. at 7, "Investment Manager Restrictions" ¶ 10(a).) Such a provision would be superfluous—as would the rest of the restrictions, for that matter—if MSIM's orders were simply to copy securities that comprise the benchmark itself.   Moreover, the restrictions limit the pension fund's exposure to higher-risk securities, not by referencing the benchmark, but by imposing credit ratings criteria on individual securities held by the fund and on the fund as a whole.   (*See id*. ¶ 8, as amended February 17, 1999.)   SVCMC does not allege that MSIM violated the credit ratings criteria, or the effective duration provision, or any other restriction.

       *Second*, if SVCMC wanted to avoid taking on greater risk than that "inherent in" the Citigroup BIG (Compl. ¶ 31), it could have instructed MSIM to use an indexing strategy or to invest fund assets directly in a passive index fund designed to track the holdings—and therefore

the risk and performance—of the applicable benchmark.[12]  It was because SVCMC wanted the performance of its investments to *exceed the benchmark* that it retained MSIM to provide active management for the pension fund, with the added growth potential and risk that such management entailed.  MSIM could not have invested solely in the type and proportion of investment products covered by the benchmark and still be expected to beat the benchmark.  Thus, by definition, it was expected that MSIM would invest in types and proportions of investment products that differed from those in the benchmark.

**B.      SVCMC Fails To Allege That MSIM's Decisions To Buy Or Hold Mortgage-Backed Securities Violated ERISA Standards at the Time They Were Made**

Courts have construed ERISA's "prudent man" duty of care as an objective standard, requiring the fiduciary (1) to employ proper methods to investigate, evaluate and structure the investment; (2) to act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment

---

[12]    As the SEC website explains,

> [a]n "index fund" describes a type of mutual fund or unit investment trust (UIT) whose investment objective typically is to achieve approximately the same return as a particular market index, such as the S&P 500 Composite Stock Price Index, the Russell 2000 Index or the Wilshire 5000 Total Market Index. An index fund will attempt to achieve its investment objective primarily by investing in the securities (stocks or bonds) of companies that are included in a selected index.  Some index funds may also use derivatives (such as options or futures) to help achieve their investment objective.  Some index funds invest in all of the companies included in an index; other index funds invest in a representative sample of the companies included in an index.

> The management of index funds is more 'passive' than the management of non-index funds, because an index fund manager only needs to track a relatively fixed index of securities.  This usually translates into less trading of the fund's portfolio, more favorable income tax consequences (lower realized capital gains), and lower fees and expenses than more actively managed funds.

Securities and Exchange Commission, "Index Funds," *available at* http://www.sec.gov/answers/indexf.htm (last visited Feb. 27, 2010).  As an example of such a fund SVCMC could have selected, Vanguard has offered institutional investors the opportunity to buy shares in its passively managed Total Bond Market Index Fund since 1995; this fund "employs a 'passive management'—or indexing—investment approach designed to *track the performance* of the Barclays Capital U.S. Aggregate Float Adjusted Bond Index."  Vanguard Total Bond Market Index Fund Fact Sheet (2010), *available at* https://institutional.vanguard.com/iippdf/pdfs/FS222R.pdf (last visited Feb. 27, 2010) (emphasis added).  Notably, even this fund does not provide for *complete* overlap with the benchmark, but only that "80% of the fund's assets will be invested in bonds held in the index."  *Id.*

decisions.[13]  ERISA's focus is on the fiduciary's conduct in arriving at the investment decision. But SVCMC pleads no facts sufficient to state a plausible claim that MSIM followed an improper investment process or that any decisions to buy or hold mortgage-backed securities were improvident *at the time they were made*.  Nor does SVCMC identify any point in time at which MSIM should have reduced or liquidated its holdings in mortgage-backed securities or allege that MSIM had a unique ability to foresee the future of the market for those securities.

Despite ERISA's clear focus on whether the fidcuiary "utilized proper methods to investigate, evaluate and structure the investment," *Laborers Nat'l Pension Fund*, 173 F.3d at 317,  the complaint contains no allegations that MSIM's *methods* were deficient.  In fact, it alleges no facts about MSIM's investment processes at all.  Moreover, as set forth below, none of SVCMC's allegations casts any doubt on the propriety of those processes.[14]

To be sure, SVCMC repeatedly asserts the conclusory allegation that the mortgage-backed securities in its account were "high-risk" (Compl. ¶¶ 1, 22, 28, 29, 34, 60).  But the facts SVCMC pleads do not support the charge.  *First*, SVCMC claims that some unspecified amount of non-agency mortgages in the pension fund included subprime mortgage securities issued by IndyMac, Bear Stearns, Washington Mutual, and Countrywide, and that three of these entities suffered losses in 2007 in connection with underperforming loans or mortgage-related investments.  (*Id*. ¶¶ 36, 38-41.)  This allegation confuses the valuation of a mortgage security with the performance of the issuer of the security.  Unlike a corporate security, the default risk of

---

[13]  *See Ulico Cas. Co.* v. *Clover Capital Mgmt., Inc.*, 217 F. Supp. 2d 311, 315-16 (N.D.N.Y. 2002); *United States* v. *Mason Tenders Dist. Council of Greater New York*, 909 F. Supp. 882, 886 (S.D.N.Y. 1995).

[14]  *See Am. Commc'ns Ass'n, Local 10, I.B.T.* v. *Ret. Plan for Employees of RCA Corp. and Subsidiary Cos.*, 488 F. Supp. 479, 483 (S.D.N.Y. 1980) (dismissing ERISA and New York common law breach of fiduciary duty claims where complaint "contain[ed] no factual specification of any act the trustees took or failed to take that resulted in the lower rate of return alleged by plaintiffs").

a mortgage-backed security depends not on the financials of the *issuer*, but on the characteristics of the underlying *mortgages*.[15]  Key factors include borrower credit history, loan-to-value ratios, delinquency and default rates, and projected recovery in case of foreclosure—all of which are characteristics of the specific loans collateralizing the mortgage security.[16]  That the issuers of some of SVCMC's securities lost money in 2007 is irrelevant.

*Second*, SVCMC alleges that analysts predicted MSIM's parent, Morgan Stanley, would write down $6 billion worth of mortgage securities "similar" to some of those in the pension fund.  (*Id.* ¶ 37.)  But SVCMC ignores that the U.S. market for residential mortgage-backed securities totaled $5.8 trillion in 2007, including a subprime sector of $824 billion and a similarly-sized Alt-A sector.[17]  SVCMC pleads no facts from which it could be inferred that *its* mortgage-backed securities were the same as, or even comparable to, the ones that Morgan Stanley wrote down—or even the ones that caused two Bear Stearns hedge funds to fold (*see id.* ¶ 40).

*Third*, SVCMC claims that Standard & Poor's downgraded the credit ratings on $7 billion worth of Alt-A mortgage securities in December 2007.  (*Id.* ¶ 42.)  But SVCMC does not allege that any securities in *its* account were downgraded—a striking omission given that the securities downgraded by Standard & Poor's made up only 1% of the Alt-A mortgage securities

---

[15]  *See* The Handbook of Mortgage-Backed Securities 30 (Frank J. Fabozzi, ed., 3d ed. 2006).

[16]  *See id.* at 30-32.

[17]  *See* International Monetary Fund, Global Financial Stability Report, April 2007, at 4-5, *available at* http://www.imf.org/external/pubs/ft/gfsr/2007/01/pdf/text.pdf (last visited February 27, 2010).

issued in 2005-06.[18]  Nor does SVCMC plead any facts linking the adverse market development

it identifies to the expected or actual performance of the securities in its account.

Individually or collectively, these allegations do not support SVCMC's claim that

MSIM "knew or should have known" the mortgage-backed securities in the pension fund were

improperly risky (*id.* ¶ 34).  Just last week, a judge in this District dismissed a complaint that

contained a "detailed overview of the subprime crisis" but did not "include any such detail as to

*the mortgage-related securities that the [mutual fund managed by defendants] held*, or as to

whether *those particular securities* declined in value in ways that defendants failed to disclose."

*Yu* v. *State St. Corp.*, --- F. Supp. 2d ----, MDL No. 1945, No. 08 Civ. 8235 (RJH), 2010 WL

668645, at *3 (S.D.N.Y. Feb. 25, 2010) (emphases added).[19]

In this respect, SVCMC's complaint is no different than so many others courts

have recently dismissed.  In *Huntington BancShares*, the Court dismissed a complaint claiming

that defendant ERISA fiduciaries "knew or should have known the extreme risk of subprime

lending" between July 2007 and August 2008 because of coverage in the popular and financial

press.  *See* 620 F. Supp. 2d at 852-53.  The Court observed that "[d]efendants cannot be held to a

---

[18]  *See* Jody Shenn, S & P Cuts Alt-A Mortgage Bonds; Analysts Warn on Prime (Update 3), Bloomberg, Dec. 19, 2007, *available at* http://www.bloomberg.com/apps/news?pid=20601009&sid=a891s97DJR1E (last visited Feb. 21, 2010).

[19]  *See also id.* at *5 ("[T]he Complaint contains no factual allegations about the Fund's mortgage-related holdings. It does not say, for example, to what extent those securities . . . were backed by subprime loans, as opposed to loans to credit-worthy corporate or individual borrowers . . . ."); *id.* at *9 ("[T]hough the complaint states that troubles in the subprime mortgage market . . . began emerging before . . . write-downs [on the fund's mortgage-related securities] occurred, the Complaint does not contain allegations showing that those market events diminished the value of any of the Fund's holdings."); *Landmen Partners Inc.* v. *The Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009) (recognizing marketwide decline and dismissing complaint that "contain[ed] no allegations that [defendant] knew that the conditions in the real estate and credit markets were reasonably likely to have a material effect on *its* portfolio of real estate investments" (emphasis in original)); *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 599, 618 (E.D. Pa. 2009) (dismissing claim that defendant should have known its low-grade subprime assets were impaired, finding plaintiffs' allegations, "if true, might be sufficient to establish declining conditions in the subprime market . . . [but] they are not particularized evidence

standard that would require them to predict the future of the financial markets." *Id*. Last November, this Court dismissed a complaint whose "allegations amount[ed] to retrospective critiques of an investment strategy that, to the plaintiffs' misfortune, resulted in failure." *Graham*, 2009 WL 3852461, at \*11; *see also id*. (much of the complaint "merely allege[d] retrospective displeasure with . . . [defendant real estate investment fund's] strategy").[20]

In short, SVCMC's claim is based on the mere ground that it lost money, a claim not permitted by ERISA.[21] As the Seventh Circuit has explained, allowing such suits "would convert [a plaintiff's ERISA account] into an account with a guaranteed return and would immunize plaintiffs from assuming any of the risk of loss associated with their investment." *DeBruyne* v. *Equitable Life Assurance Soc'y of U.S.* ("*DeBruyne II*"), 920 F.2d 457, 465 (7th Cir. 1990), *aff'g* 720 F. Supp. 1342 (N.D. Ill. 1989) ("*Debruyne I*"). Thus, "the ultimate outcome of an investment is not proof of its imprudence." *Id*. at 465.

These principles take on particular import where, as here, a plaintiff sues its investment manager against the backdrop of a marketwide downturn. As has been widely

---

that the defendants knew or must have known that their statements and omissions presented a danger of misleading buyers or sellers").

[20]   *See also In re Citigroup Inc. S'holder Derivative Litig.* ("*Citigroup II*"), No. 07 Civ. 9841 (SHS), 2009 WL 2610746  at \*6 (S.D.N.Y. Aug. 25, 2009) ("newspaper articles chronicling the collapse of the subprime mortgage market" did not show that defendant directors "'were consciously disregarding a duty somehow to prevent Citigroup from suffering losses'" (quoting *In re Citigroup Inc. S'holder Derivative Litig.* ("*Citigroup I*"), 964 A.2d 106, 128 (Del. Ch. 2009)); *Pittleman* v. *Impac Mortgage Holdings, Inc.*, No. SACV 07-0970, 2009 WL 648983, at \*4 (C.D. Cal. Mar. 9, 2009) (allegations regarding company's failure to disclose worsening conditions against the backdrop of a deteriorating subprime market did not tell a story of fraud, but of "a company involved in a volatile industry at the onset of a long, destructive economic downturn"); *Citigroup I*, 964 A.2d at 128 ("The warning signs alleged by plaintiffs are not evidence that the directors consciously disregarded their duties or otherwise acted in bad faith; at most they evidence that the directors made bad business decisions [in the subprime mortgage market]. The 'red flags' in the Complaint amount to little more than portions of public documents that reflected the worsening conditions in the subprime mortgage market and in the economy generally.").

[21]   *See, e.g., Ulico Cas. Co.* v. *Clover Capital Mgmt., Inc.*, 335 F. Supp. 2d 335, 340 (N.D.N.Y. 2004) ("The focus of the [ERISA prudent man] inquiry is what steps the fiduciary took before making the decision to act, and not

recognized, the housing crisis and subsequent global financial downturn were much worse than anyone—MSIM, other market participants, and regulators—could have predicted.  Former SEC Chairman David Ruder stated in November 2008:

> One key aspect of the credit crisis was the failure of both market participants and regulators to predict the collapse of the home loan mortgage market.  None of the primary market participants predicted the collapse.  The risk management systems of most banks, investment banks, ratings agencies, and credit default swap insurers did not predict the collapse.  Regulators, including the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Department of Treasury, the SEC, and the Commodity Futures Trading Commission did not predict the collapse.[22]

Courts decline to impose ERISA liability in such cases.  *See, e.g.*, *DeBruyne I*, 720 F. Supp. at 1349 ("[Defendants] made one primary mistake:  They failed to foresee a stock market debacle that few financial experts had anticipated.  This court simply cannot hold defendants liable for an inability to predict the stock market crash [of 1987].").[23]

---

whether the action succeeded or failed."); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (courts applying ERISA "focus[] on a fiduciary's conduct in arriving at an investment decision, not on its results").

[22] Testimony Before U.S. House of Representatives Committee on Oversight and Government Reform, Nov. 13, 2008, at 4, *available at* http://oversight.house.gov/images/stories/documents/20081113101847.pdf (last visited February 27, 2010).  Additional statements by regulators and others further demonstrate how the depth of the financial crisis was not anticipated in 2007.  For example, Federal Reserve Chair Ben Bernanke stated in May 2007 that "the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system."  Speech at Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, May 17, 2007, *available at* http://www.federalreserve.gov/newsevents/ speech/bernanke20070517a.htm (last visited February 27, 2010).  Treasury Secretary Henry Paulson later observed, "We have not in our lifetime dealt with a financial crisis of this severity and unpredictability." Testimony Before U.S. House of Representatives Financial Services Committee, Nov. 18, 2008, at 1, *available at* http://financialservices.house.gov/hearing110/paulson111808.pdf (last visited February 27, 2010). Additional examples from congressional testimony and other sources are readily available online.

[23] *Cf., e.g.*, *Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.) ("While greater clairvoyance in 1973 might have led to a realization that foreign governments and enterprises might encounter difficulties, particularly in consequence of the dramatic increase in petroleum prices[,] . . . and that New York City would come to the verge of bankruptcy . . . , failure to make such perceptions does not constitute fraud."); *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 363-65 (S.D.N.Y. 2003) (dismissing securities fraud complaint where plaintiffs attempted to hold defendants liable for failing to foresee the bursting of the "Internet bubble" and resulting repercussions in the stock market).

SVCMC's complaint is a transparent effort to use hindsight to manufacture a claim.  More than two hundred cases have been filed nationwide against virtually every firm in the financial services industry, alleging that each of these companies should have anticipated—or had actual knowledge of—the overvaluation of mortgage-backed securities but failed to avoid losses.[24]  That so many institutions made similar risk assessments, and sustained similar losses, only confirms the unpredictability of the meltdown of the mortgage securities market and its profound effect on the financial system.  SVCMC's allegations provide no basis to infer that MSIM should have predicted what the rest of the industry missed.  Indeed, SVCMC's own behavior reinforces the point.  Between 2007 and 2009, despite receiving regular, frequent, and detailed updates about its holdings in mortgage-backed securities, *SVCMC never rescinded its authorization to invest in such securities*.

## II.

### QIL DOES NOT ADEQUATELY ALLEGE THAT MSIM DEPARTED FROM THE SPECIFIED INVESTMENT STRATEGY OR VIOLATED COMMON LAW DUTIES

Although QIL asserts breach of duties under the common law rather than ERISA, it relies on allegations paralleling those of SVCMC, namely, that MSIM "deviated from the [insurance fund's] specified strategy" (Compl. ¶ 48) by:  (a) placing a "majority of the Insurance Fund's fixed-income assets in a single, proprietary fund of MSIM" (*id*. ¶ 49), and (b) failing to manage the fixed-income portfolio "in accord with the . . . designated benchmark index" (*id*. ¶ 53).  However, MSIM's investments in mortgage-backed securities on behalf of the insurance fund were expressly authorized by the underlying contract with QIL, and therefore MSIM did not breach any contract with QIL or deviate from any investment strategy in breach of any

---

[24]   *See* Kevin LaCroix, The D&O Diary: Subprime and Credit Crisis-Related Securities Class Action Lawsuits (2010), *available at* http://www.oakbridgeins.com/clients/blog/subprimelawsuitslist.doc (last visited Feb. 26, 2010) (listing 207 subprime-related class action lawsuits).

fiduciary duty.  *See Guerrand-Hermès* v. *J.P. Morgan & Co.*, 769 N.Y.S.2d 240, 242-43 (1st Dep't 2003) (dismissing breach of contract, negligence, and breach of fiduciary duty claims based on allegation that defendant invested "entire discretionary account in high-risk emerging markets securities" because agreement specifically provided for investment in such securities, and defendant "was not contractually bound to hedge the discretionary account" as investments "w[ere] in compliance with the investment guidelines' diversification requirements").

> A.    **MSIM Did Not Breach Its Contractual or Fiduciary Duties By Following QIL's Directions To Invest in Mortgage-Backed Securities**

QIL asserts that MSIM breached its fiduciary and contractual duties through its investment in the OAMP, which supposedly created an "over-concentration [of insurance fund assets] in mortgage securities," including non-agency mortgage securities, and "expos[ed] the [fund] to excessive risk" (Compl. ¶¶ 48, 49).  But this did not represent any departure from QIL's investment strategy:  before MSIM invested in the OAMP, QIL asked for and received a prospectus explaining that the OAMP invested in non-agency mortgage-backed securities, and that such securities "*may entail greater risk*" (Braccia Aff. Ex. 14, at 14)  Fully informed of these risks, QIL consented to investment in the OAMP.  It now seeks to hold MSIM liable for doing what it authorized MSIM to do.  But there can be no breach of contract or breach of fiduciary duty claim when MSIM complied with the contract.

MSIM also disclosed in QIL's monthly account statements that the OAMP contained non-agency mortgages.[25]  Yet throughout 2007 and 2008, QIL never directed MSIM to sell its OAMP shares.  In fact, in April 2008, QIL added a guidelines restriction to preclude MSIM from selling any investments at a loss without prior QIL approval.  (Braccia Aff. Ex. 13.)

---

[25]   *E.g.*, Insurance Fund Account Statement Mar. 31, 2009, Braccia Aff. Ex. 15 (showing fund held 0.8% non-agency mortgages).

**B.    MSIM Did Not Breach Its Contractual or Fiduciary Duties by Failing To Invest Insurance Fund Assets in Accord With the Fund's Benchmark Index**

QIL's contention that MSIM breached its fiduciary and contractual duties by neglecting to invest insurance fund assets "in accord with the . . . designated benchmark index" (Compl. ¶ 53) also fails.   QIL contends that the guidelines designated a "conservative" performance benchmark (*id*. ¶ 47) and that the mortgage-backed securities in its account "were not suited" to "an insurance fund that required a high-grade, liquid portfolio" (*id*. ¶ 52).   QIL mischaracterizes the documents on which it relies.   The investment guidelines say nothing about the benchmark being "conservative" or limiting the securities allowable for the insurance fund, or about the need for a "high-grade, liquid portfolio."   Rather, the insurance fund guidelines contain concrete directives and restrictions.   As with the pension fund guidelines, the only mention of the benchmark in these directives has to do with the effective duration of the insurance fund, which must be kept "within a +/-25% band of the portfolio's benchmark." (Braccia Aff. Ex. 13, ¶ 7.)   As with the pension fund restrictions, there would be no need for such a guideline if MSIM had been hired simply to mimic the benchmark.   And as with the pension fund restrictions, the insurance fund guidelines established a threshold for risk by setting minimal credit ratings for the individual securities held by the fund and for the fund as a whole. QIL does not allege that MSIM violated the effective duration, credit rating, or any other, restraints.

QIL therefore fails to state a claim.   The recent decision in *Assured Guaranty (UK) Ltd.* v. *J.P. Morgan Inv. Mgmt., Inc.*, Index No. 603755/08 (Sup. Ct., N.Y. County, Jan. 29, 2010) (attached hereto as Exhibit A) is illustrative.   *Assured Guaranty* rejected plaintiff's argument that its investment manager's supposedly risky investments in mortgage-backed securities—which were within the limitations imposed by the guidelines—violated the

"contractual investment objective, *i.e.*, to obtain reasonable income while providing a 'high level of safety of capital.'"   *See* Op. at 13-14 (dismissing contract claim); *see also Vladimir* v. *Cowperthwait*, 839 N.Y.S.2d 761, 762-63 (1st Dep't 2007) (investment advisor who complied with diversification requirements was not liable for breach of fiduciary duty despite fact that portfolio did not achieve expected returns).[26]

Indeed, QIL does not even plead any facts to show that MSIM's investments on behalf of the insurance fund were inconsistent with the components of the benchmark.  Although QIL claims that the benchmark was "conservative" (Compl. ¶ 47), and the mortgage-backed securities MSIM purchased "high-risk" (*id.* ¶ 48), QIL pleads no specifics as to how the latter compared to the former.  QIL's conclusory allegation does not suffice under *Iqbal* and *Twombly*.

In any event, QIL's claim that a "majority" of the fixed-income assets under MSIM's management were exposed to mortgage-backed securities is grossly exaggerated.  Mortgage-backed securities comprised no more than 15% percent of the fund at any point between 2007 and 2009.[27]

### C.    QIL Fails To Allege Anything More Than Investment Losses

At bottom, QIL's claim is that because it lost money on mortgage-backed securities, MSIM must have breached a duty by exposing it to those securities.  But liability cannot be premised merely on "[t]he fact that [a] portfolio did not achieve what plaintiff—after reviewing its history, managers and investment strategy—believed it would achieve."  *Vladimir*,

---

[26]   *Cf.*, *e.g.*, *Lefkowitz* v. *Smith Barney, Harris Upham & Co.*, 804 F.2d 154, 156 (1st Cir. 1986) (dismissing claim based on unsuitability of investments in investor's account, where, "even accepting all of appellant's factual allegations as true and drawing all *reasonable* inferences in appellant's favor, . . . the factual allegations contained in his complaint do not support his claim that [the supposedly defrauded investor] sought to invest exclusively at low levels of risk" (emphasis in original)).

[27]   *E.g.,* Insurance Fund Account Statement Mar. 31, 2009, Braccia Aff. Ex. 15 (showing 12.2% of insurance fund consisted of mortgage-backed securities as of March 31, 2009, and 11.2% as of December 31, 2008).

839 N.Y.S.2d at 762-63; *see also Guerrand-Hermès*, 769 N.Y.S.2d at 242-43 (dismissing, *inter alia*, breach of contract and breach of fiduciary duty claims).[28]   Rather, plaintiffs must "particularize how [defendant's] recommendations constituted a deviation from the standard of care owed by an investment advisor."[29]   Plaintiffs cannot clear this hurdle without pleading facts related to the specific investments alleged to have breached a duty.  *See Assured Guaranty*, Op. at 15-16 (rejecting argument that defendant knew of risks of holding mortgage-backed securities based on press article discussing instability of types of securities never purchased for plaintiff).

Here, QIL fails to allege anything other than that its investments in mortgage-backed securities lost money.  The nine paragraphs of the complaint devoted to QIL's claims provide no detail on the particular mortgage-backed securities QIL held and add nothing to SVCMC's allegations—insufficient for the reasons explained above—that MSIM knew or should have known it was taking on inappropriate risks by investing in mortgage-backed securities.   Nor does QIL identify any point at which the risk of continuing to hold such securities became apparent.   In fact, QIL's own conduct points to a contrary conclusion: between 2007 and 2009, *QIL never rescinded its authorization to hold such securities.*

### III.

### SVCMC'S ERISA CLAIM SHOULD BE DISMISSED FOR OTHER, INDEPENDENT REASONS

SVCMC's ERISA claim should be dismissed for the independent reasons that the complaint does not adequately allege that SVCMC's losses were caused by any alleged

---

[28]   *Cf., e.g., Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Actual performance will shed little light on [an investment's] *ex ante* suitability for a given investor.").

[29]   *See Rasmussen* v. *A.C.T. Envtl. Servs. Inc.*, 739 N.Y.S.2d 220, 222 (3d Dep't 2002) (granting summary judgment to defendant where "the best criticism voiced by plaintiff in the record was that [defendant] had suggested a 'faulty strategy'").

violations of ERISA, or that MSIM made any misrepresentations or violated any duty to diversify under ERISA.  Moreover, SVCMC's claim is barred by a provision of the investment management agreement under which SVCMC waived the right to seek redress for investments to which it did not object in writing to MSIM within 90 days.

### A.    SVCMC Does Not Adequately Allege Loss Causation

SVCMC fails adequately to plead loss causation; that is, SVCMC does not plead sufficient facts alleging that MSIM's conduct—rather than the market-wide decline—caused SVCMC's losses.  Under ERISA, plaintiffs are obligated to plead and prove a causal connection between the loss allegedly suffered and the acts and omissions of which they complain.  *See Silverman* v. *Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (ERISA plaintiff must show fund's losses "resulted from" fiduciary's breach).

Plaintiffs cannot satisfy this requirement by identifying supposed misconduct and then stating a dollar amount, as the complaint does here (*see* ¶ 27).[30]  Rather, plaintiffs must allege a sufficient factual basis for attributing the losses to the misconduct—as opposed to other factors—and ascribe at least some rough proportion of the losses claimed to the misconduct.[31] These mandates are especially crucial when "the plaintiff's loss coincides with a marketwide

---

[30]    *See Colliton* v. *Cravath, Swaine & Moore, LLP*, No. 08 Civ. 0400 (NRB), 2008 WL 4386764, at *9-10 (S.D.N.Y. Sept. 24, 2008) (applying *Twombly* to dismiss plaintiff's complaint on loss causation grounds, where plaintiff asserted sixteen breaches of ERISA duties and claimed $15,000 in injuries but "d[id] not assert how he arrived at this figure, whether the figure is an actual loss or failure to make an additional $15,000, or, even which of the sixteen different breaches actually caused the 'loss'").

[31]    *See, e.g., Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (dismissing claim where plaintiffs did not allege facts showing that defendant's misstatements, as opposed to other causes, "were the proximate cause of plaintiffs' loss" and did not "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements"); *Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 592-93 (E.D. Pa. 2009) (dismissing complaint that did not allege facts apportioning losses between alleged fraud and marketwide decline in mortgage-backed securities); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164-65 (D. Mass. 2009) (dismissing complaint when share price drop "coincided with a significant downturn in the credit markets and [stock]'s own preexisting pattern of . . . declines" (footnote omitted)) (citing *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994))).

phenomenon causing comparable losses to other investors," diminishing the "prospect that the plaintiff's loss was caused by" the defendant's actions, *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks omitted).  Under ERISA, a plaintiff must also show what an "equally plausible and most appropriate investment alternative would have earned."  *In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1137 (C.D. Cal. 2009) (internal quotation marks omitted) (drop in value of investments did not show loss causation where plaintiff offered no evidence of what any alternative investments would have earned).

SVCMC fails to meet these standards.  The only fact pled in support of loss causation is that, during the quarters the pension fund held a roughly 10% stake in non-agency mortgage securities, it underperformed a benchmark devoid of such securities.  (Compl. ¶ 26.) But SVCMC ignores that, starting in mid-2007, the country entered into the deepest economic recession since the Great Depression and that this downturn decimated securities prices.  In the face of this tide of losses, SVCMC does not provide a sufficient basis to infer that the underperformance relative to the benchmark was due to investments in mortgage-backed securities.[32]

SVCMC also fails to apportion losses or explain how it arrives at the $25 million figure alleged as damages (Compl. ¶ 27).  The complaint does not allege that MSIM should have avoided mortgage-backed securities altogether; it concedes that even the Citigroup BIG benchmark contained some mortgage-backed securities.  (Compl. ¶ 24.)  Rather, SVCMC's theory is that the pension fund included too great a percentage of mortgage-backed securities, or

---

[32]   *See Healthcare Fin. Group, Inc.* v. *Bank Leumi USA*, --- F. Supp. 2d ----, No. 08 Civ. 11260 (VM), 2009 WL 3631036, at *5 (S.D.N.Y. Oct. 26, 2009) (plaintiffs did not plead loss causation because collapse of auction rate securities market, rather than defendant's alleged misrepresentations, caused plaintiffs' losses); *cf. DeBruyne II*, 920 F.2d at 465 (in absence of evidence as to investment's volatility preceding 1987 market crash, "[f]or all we know, [defendant] is entirely correct in its assertion that plaintiffs' losses were caused by an unexpected, and uncontrollable, drop in the stock market").

that it held non-agency securities.  But SVCMC fails to tie the holding of any specific set of mortgage-backed securities to a corresponding amount or proportion of losses.

Finally, SVCMC fails to identify an "equally plausible and most appropriate alternative investment" or explain what it would have earned.  Although SVCMC refers to the pension fund's underperformance of the benchmark, it identifies no alternative investments that would have been appropriate for a manager trying to *outdo* the benchmark.

**B.     SVCMC Does Not Adequately Allege Any Failure To Diversify**

SVCMC complains that MSIM failed to diversify the pension fund, "achieving a disproportionate exposure to the risk of the mortgage securities markets."  (Compl. ¶ 32.) SVCMC states that "more than 60%" of pension fund assets were held in the AMP, resulting in the fund having 9% to 12.6% of its fixed income assets devoted to non-agency mortgage securities in 2007-08.  (*Id*. ¶¶ 23-25.)  SVCMC fails to state a breach of duty by MSIM.

ERISA requires diversification so as "to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  29 U.S.C. § 1104(a)(1)(C).  This provision does not put a numerical cap on the level of any given type of investment.  Although the complaint alleges that 60% of pension fund assets were invested in the AMP, it does not allege that the AMP itself was not suitably diverse.  Nor could it, given that the fund held a variety of agency and non-agency mortgages and short-term investments.  More important, the complaint fails to explain why a stake in non-agency mortgage securities of 9% to 12.6%—a number that by definition means that *at least 87.4% of the fixed-income portfolio was invested in assets other than non-agency mortgage securities*—means that the pension fund was not adequately diversified.  *See Laborers Nat'l Pension Fund*, 173 F.3d at 322 (diversification is judged not by assessing risks of individual investments but in light of portfolio as a whole).

## C.   SVCMC Does Not Adequately Allege Any Misrepresentations

In a single sentence, SVCMC alleges that MSIM "misrepresented the risk embedded in the fixed-income portfolio." (¶ 28). This claim—that MSIM misled SVCMC— sounds in fraud, triggering Federal Rule of Civil Procedure Rule 9(b)'s particularity requirements.[33]  The complaint, however, does not allege what misrepresentations were made, and therefore fails to state a claim. Indeed, SVCMC's allegations are deficient under Rule 8.[34]

To the extent SVCMC relies on its allegation that MSIM deviated from the components of the Citigroup BIG benchmark, the claim is unavailing.  As explained above, the designation of a benchmark did not constitute a promise to make only those types of investments comprising the benchmark, nor—given the expectation that MSIM would beat the benchmark— could the benchmark have limited the scope of MSIM's investments.  SVCMC also received AMP fund prospectuses alerting it to the risks of investing in mortgage securities, AMP shareholder reports stating what securities (including non-agency mortgage securities) made up the fund, and monthly account statements showing the amount of pension fund investments in the AMP and in mortgage securities.  Such information was sufficient to alert an institutional investor like SVCMC to the "risks" embedded in its account.  *See, e.g., In re Bausch & Lomb, Inc. ERISA Litig.*, No. 06 Civ. 6297, 2008 WL 5234281, at *9 (W.D.N.Y. Dec. 12, 2008) ("ERISA imposes a legal duty to disclose to the beneficiary only those material facts, known to

---

[33]   *See*, *e.g.*, *Caputo* v. *Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (ERISA plaintiff alleging breach of fiduciary duty through misrepresentations must specify the "time, place, speaker, and content of the alleged misrepresentations," "explain how the misrepresentations were fraudulent," and "plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth" (internal quotation marks and alteration omitted)).

[34]   *See*, *e.g.*, *In re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030, 2002 WL 31431588, at *15-16 (N.D. Cal. Sept. 30, 2002) (complaint failed to meet standard of Rule 8 where allegation that an ERISA fiduciary "fail[ed] to communicate truthful information" was unsupported by any additional allegation).

the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection." (internal quotation marks omitted)).[35]

### D.   SVCMC's Claim Is Barred Because It Failed To Object in Writing To the Transactions Within the Required Time Period

The investment management agreement required MSIM to provide St. Vincent with a "complete valuation" of the pension fund at least every three months (Braccia Aff. Ex. 1, ¶ 7(b)), a duty MSIM fulfilled by sending monthly account statements (among other materials) to SVCMC.  SVCMC agreed that "[e]xcept with respect to any act or transaction of [MSIM] as to which the Hospital or . . . [its Investment] Committee shall file a written objection with [MSIM] within a period of ninety (90) days from the date of receipt of each [such] report," MSIM "shall upon the expiration of such period be forever released and discharged from any liability or accountability to the Hospital or the [Investment Committee] as respects the propriety of its acts and transactions shown in such statements."  (Braccia Aff. Ex. 1, ¶ 9.)

The account statements that MSIM sent to St. Vincent specified, among other things, how much of the pension fund was held in AMP shares, mortgage securities, and non-agency mortgage securities.[36]  Indeed, starting in the second half of 2008, MSIM listed agency mortgages in six subcategories, and non-agency mortgages in three.  The 90-day provision exists precisely so that SVCMC—which was on notice of the specific assets in which the fund was invested—could raise any issues with those investments at or close to the time in which those investment decisions were made, thereby presumably minimizing the potential for large losses based on investments contrary to what it wanted.  Thus, if there were any failure to diversify, or

---

[35]   *Cf. Lanka* v. *O'Higgins*, 810 F. Supp. 379, 389 (N.D.N.Y. 1992) (declining to find breach of ERISA duties where plaintiffs were aware of risks posed by investment manager's philosophy).

[36]   *E.g.*, Pension Fund Account Statement Mar. 31, 2009, Braccia Aff. Ex. 10.

any deviation from the guidelines, or any misrepresentation, SVCMC could see that on its account statements and promptly notify MSIM.

In fact, SVCMC stated that it would monitor the pension fund on a quarterly basis and retained the right to bring in outside assistance to do so.  (Braccia Aff. Ex. 2, at 7, "Investment Manger Review.")  Yet SVCMC did not object in writing to the transactions of which it now complains within 90 days of receipt of its statements; thus, it cannot do so now.[37]

## IV.

### QIL'S COMMON LAW CLAIMS SHOULD BE DISMISSED<br>FOR OTHER, INDEPENDENT REASONS

QIL's contract and fiduciary duty claims both should be dismissed for the reasons set forth in Part II above.  In addition, both claims should be dismissed for the independent reason that QIL does not adequately allege that its claimed losses were proximately caused by MSIM's alleged breaches of duty.  Moreover, QIL's breach of fiduciary duty claim should be dismissed because it is preempted by New York's Martin Act, is duplicative of the breach of contract claim, and is barred by the economic loss doctrine.

### A.     QIL Does Not Adequately Allege Proximate Causation

Both of QIL's claims should be dismissed for failure to plead proximate causation of QIL's alleged losses.  Under New York law, proximate cause is an element of breach of fiduciary duty claims, *see*, *e.g.*, *Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536-37 (1st Dep't 2002), and breach of contract claims, *see*, *e.g.*, *Jorgensen* v. *Century 21 Real Estate Corp.*, 629 N.Y.S.2d 268, 269-70 (2d Dep't 1995).  In the securities context, courts in this Circuit have likened proximate causation to the concept of loss causation under the federal securities laws and drawn

---

[37]     *See, e.g., Schetter* v. *Prudential-Bache Sec. Inc.*, 695 F. Supp. 1077, 1083 (E.D. Cal. 1988) (applying ratification and estoppel to ERISA claim).

upon federal loss causation precedents in assessing the adequacy of New York common law claims. *See Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009).

Thus, like SVCMC, QIL must allege that its losses resulted from MSIM's conduct, rather than the marketwide declines of 2007-09, and must roughly apportion losses among MSIM's alleged conduct and other possible intervening factors. (*See supra* n.31 and accompanying text.) This, QIL utterly fails to do. QIL's claims should therefore be dismissed.[38]

**B.    QIL's Common Law Breach of Fiduciary Duty Claim
Is Preempted by New York State's Martin Act**

QIL's common law breach of fiduciary duty claim is barred by the Martin Act. *See* N.Y. Gen. Bus. Law, Art. 23-A, § 352 *et seq.* The Martin Act, New York's "blue-sky" law, equips the State with sweeping authority to investigate and prosecute securities claims in New York. *Id.* The New York Court of Appeals has held that there is no implied private right of action under the Act. *See CPC Int'l Inc.* v. *McKesson Corp.*, 70 N.Y.2d 268, 275 (1987).

---

[38]    Indeed, in a growing consensus, cases assessing similar claims under the laws of fourteen additional states— including several decided at the pleading stage—have concluded that loss causation is a requirement. *See, e.g.*, *Grand* v. *Nacchio*, 147 P.3d 763, 782 (Ariz. Ct. App. 2006); *OCM Principal Opportunities Fund* v. *CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 861-62 (Cal. Ct. App. 2007); *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1368-69 (N.D. Cal. 1987) (California law); *Greenberg* v. *De Tessieres*, 902 F.2d 1002, 1004 (D.C. Cir. 1990) (District of Columbia law); *Holmes* v. *Grubman*, --- S.E.2d ----, No. S09Q1585, 2010 WL 424225, at *5-6 (Ga. Feb. 8, 2010); *Martin* v. *Heinold Commodities, Inc.*, 643 N.E.2d 734, 746-47 (Ill. 1994); *Pippenger* v. *McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1427-28 (S.D. Ind. 1994) (Indiana law); *Kimbrell* v. *Adia, S.A.*, 929 F. Supp. 373, 379 (D. Kan. 1996) (Kansas law); *Vaso Active Pharms., Inc.* v. *Robinson & Cole LLP*, No. 06-4958, 2009 WL 971161, at *1 (Mass. Super. Jan. 23, 2009); *Brian M. Kelly Trust* v. *Adkison, Need, Green & Allen, PLLC*, No. 268550, 2007 WL 708598, at *6 (Mich. Ct. App. Mar. 8, 2007), *rev'd on other grounds*, 480 Mich. 909 (Mich. 2007); *Carey* v. *Select Comfort Corp.*, No. 27CV 04-015451, 2006 WL 871619, at *3 (Minn. Dist. Ct. Jan. 30, 2006); *Schaaf* v. *Residential Funding Corp.*, 517 F.3d 544, 549-53 (8th Cir. 2008) (Minnesota statutory and common law); *McCabe* v. *Ernst & Young, LLP*, 494 F.3d 418, 438-39 (3d Cir. 2007) (New Jersey law), *aff'g* No. 01-5747, 2006 WL 42371, at *13 (D.N.J. Jan. 6, 2006); *Rubin* v. *Schottenstein, Zox & Dunn*, 119 F. Supp. 2d 787, 791 (S.D. Ohio 2000) (Ohio law); *Bouriez* v. *Carnegie Mellon Univ.*, 585 F.3d 765, 774 n.6 (3d Cir. 2009) (Pennsylvania law); *Glaser* v. *Enzo Biochem, Inc.*, 464 F.3d 474, 477-80 (4th Cir. 2006) (Virginia law); *see also Bailey* v. *Lewis Farm, Inc.*, 139 P.3d 1014, 1026 (Or. Ct. App. 2006) (Armstrong, J. dissenting), *rev'd*, 343 Or. 276, 289-90 (Or. 2007).

New York courts have consistently held that "the Martin Act preempts any common law claims within its purview," as "allowing private litigants to press common law claims covered by the Martin Act would upset the Attorney General's exclusive enforcement power in exactly the same way" as allowing private claims under the Martin Act itself. *Nanopierce Techs., Inc.* v. *Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *2 (S.D.N.Y. Sept. 2, 2003) (collecting and discussing New York state court decisions).[39]  As this Court has noted, "common law causes of action are routinely dismissed as improper attempts to bring private claims over conduct covered by the Martin Act under a different label."  *Owens* v. *Gaffken & Barriger Fund, LLC*, No. 08 Civ. 8414 (PKC), 2009 WL 3073338, at *13 (S.D.N.Y. Sept. 21, 2009).[40]

In particular, New York courts have barred fiduciary duty claims relating to the purchase of securities.  *See Assured Guaranty*, Op. at 9-12 (applying Martin Act to dismiss breach of fiduciary duty and gross negligence claims asserted against investment manager for placing assets in allegedly high-risk mortgage-backed securities).[41]  Courts in this Circuit have also found such claims to be preempted.  *See Abbey* v. *3F Therapeutics Inc.*, No. 06 Civ. 409 (KMW), 2009 WL 4333819, at *13-14 (S.D.N.Y. Dec. 2, 2009) (noting "the weight of legal authority in favor of Martin Act preemption of a private right of action for . . . common law

---

[39]  *See, e.g.*, *CPC Int'l Inc.*, 70 N.Y.2d at 275; *Whitehall Tenants Corp.* v. *Estate of Olnick,* 623 N.Y.S.2d 585, 585 (1st Dep't 1995) ("[P]rivate plaintiffs will not be permitted through artful pleading to press any claim based on the sort of wrong given over to the Attorney General under the Martin Act."); *Breakwaters Townhomes Ass'n of Buffalo, Inc.* v. *Breakwaters of Buffalo, Inc.,* 616 N.Y.S.2d 829, 829 (4th Dep't 1994) ("It is well established that there is no implied private cause of action for violation of the antifraud provisions of [the Martin Act].").

[40]  Cases concluding otherwise have been described as "solitary islands in a stream of contrary opinion." *Nanopierce Techs.*, *Inc.*, 2003 WL 22052894, at *4.

[41]  *See also Horn* v. *440 East 57th Co.*, 547 N.Y.S.2d 1, 5 (1st Dep't 1989) (dismissing claims for breach of fiduciary duty); *Jana Master Fund, Ltd.* v. *JPMorgan Chase & Co.*, No. 604005/06, 2008 WL 746540, at *5 (N.Y. Sup. Ct. Mar. 12, 2008) (same).

claims that do not require proof of scienter"); *Sabella* v. *Scantek Med., Inc.*, No. 08 Civ. 453 (CM) (HBP), 2009 WL 3233703, at *37-39 (S.D.N.Y. Sept. 25, 2009) (dismissing investors' fiduciary duty claims as preempted by the Martin Act); *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 182 (S.D.N.Y. 2009) (same).[42]

Accordingly, count three of the complaint, which is premised on defendant's purchases of the securities in the insurance fund, is barred by the Martin Act.

### C.   QIL's Common Law Breach of Fiduciary Duty Claim Should Be Dismissed as Duplicative of the Breach of Contract Claim

QIL's common law breach of fiduciary duty claim should also be dismissed as duplicative of its breach of contract claim. QIL fails to allege any breach of fiduciary duty that is independent of a breach of the obligations under the insurance fund's investment management agreement and guidelines. New York courts routinely dismiss such claims. *See, e.g., Brooks* v. *Key Trust Co. Nat'l Ass'n*, 809 N.Y.S.2d 270, 272-73 (3d Dep't 2006); *Alitalia Linee Aeree Italiane, S.p.A.* v. *Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294-95 (S.D.N.Y. 2008) (Castel, J.) (citing *Brooks*). As the Court in *Brooks* explained,

> [t]he allegations underlying plaintiff's fiduciary duty claim—based upon defendants' . . . failure to advise plaintiff and prudently manage and diversify his portfolio . . . —are either expressly raised in plaintiff's breach of contract claim or encompassed within the

---

[42]   *See also Castellano* v. *Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (finding "claim under New York state law for breach of fiduciary duty" to be "barred by the Martin Act"); *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 612 (S.D.N.Y. 2008) (dismissing breach of fiduciary duty claim); *Kassover* v. *UBS AG & UBS Fin. Servs., Inc.*, 619 F. Supp. 2d 28, 35-40 (S.D.N.Y. 2008) (same); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2007) (expressing agreement "with the analysis set forth in . . . a host of other [New York] state and federal decisions finding breach of fiduciary duty claims arising in the securities context to be preempted by the Martin Act," and noting that "[t]his analysis is consistent with the statute's broad reach and purpose"); *Greene* v. *Hanover Direct, Inc.*, No. 06 Civ. 13308 (NRB), 2007 WL 4224372, at *5 (S.D.N.Y. Nov. 19, 2007) (holding that "[w]ith respect to breach of fiduciary duty and negligent misrepresentation, New York courts have long-recognized that such claims are preempted by the Martin Act" (footnote omitted)); *Sedona Corp.* v. *Ladenburg Thalmann & Co.*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005) ("Indeed, the weight of authority holds that common law claims of negligent misrepresentation, negligence, and breach of fiduciary duty arising from securities fraud are preempted by the Martin Act.").

>contractual relationship by the requirement implicit in all contracts
>of fair dealings and good faith.

809 N.Y.S.2d. at 272 (upholding dismissal of breach of fiduciary duty claim against financial advisor with discretionary authority to manage investment accounts).  Here, QIL's fiduciary and contract claims overlap completely:  Both are based on the allegation that MSIM exposed the insurance fund to excessive risk by overinvesting in mortgage securities.  (*See* Compl. ¶ 48.) Thus, the claim for breach of fiduciary duty should be dismissed as duplicative.[43]

### D.    QIL's Common Law Breach of Fiduciary Duty Claim Is Barred By the Economic Loss Doctrine

Pursuant to New York's "economic loss doctrine," a plaintiff may not recover in tort for purely economic loss allegedly resulting from a breach of contract.  *Bristol-Myers Squibb, Indus. Div.* v. *Delta Star, Inc.*, 620 N.Y.S.2d 196, 198-99 (4th Dep't 1994) (noting that the "economic loss rule serves to limit the liability of providers of services as well as providers of products").  In other words, a plaintiff who has allegedly sustained an economic loss, but has not sustained any injury to person or property, *is limited to recovery in contract*.[44]  Here, QIL's allegations of loss are for economic losses only.  Accordingly, the common law breach of fiduciary duty claim should be dismissed as a matter of law.

---

[43]  *See Robin Bay Assocs.* v. *Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *3-4 (S.D.N.Y. June 3, 2008) (dismissing breach of fiduciary duty claim where supposed breach involved "a failure to perform duties that are contractual in nature, as compared to affirmative acts of betrayal or fraud that violate standards of conduct beyond those bargained for in the contract").

[44]  *See Rivkin* v. *Heraeus Kulzer GmbH*, 734 N.Y.S.2d 31, 32-33 (1st Dep't 2001) (dismissing claim for defective product claim as barred by economic loss rule); *Atlas Air, Inc.* v. *Gen. Elec. Co.*, 791 N.Y.S.2d 620, 621 (2d Dep't 2005) (dismissing claims for negligence and products liability); *Trump Int'l Hotel & Tower* v. *Carrier Corp.*, 524 F. Supp. 2d 302, 312-13 (S.D.N.Y. 2007) (dismissing negligence claim).

## CONCLUSION

For the reasons set forth above, MSIM respectfully requests that the Court dismiss plaintiffs' complaint, with prejudice.

Dated: New York, New York
       March 2, 2010

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/  Richard A. Rosen
     Richard A. Rosen (rrosen@paulweiss.com)
     Douglas M. Pravda (dpravda@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019
Tel.:  (212) 373-3000
Fax:  (212) 757-3990

*Attorneys for Defendant Morgan Stanley Investment Management, Inc.*

35